[No. 57029-9. En Banc. May 14, 1992.]

SINTRA, INC., ET AL, *Appellants,* v. THE CITY OF SEATTLE, ET AL, *Respondents.*

2

4

*Richard B. Sanders,* for appellants.

*Mark H. Sidran, City Attorney,* and *Miriam Reed, Assistant,* for respondents.

*Ronald J. Zumbrun, Edward J. Connor, Jr., John M. Groen,* and *Ben J. Gantt, Jr.,* on behalf of Pacific Legal Foundation, amicus curiae for appellants.

DURHAM, J. — In this land use action, we are asked to decide for the first time the impact of federal civil rights actions on our takings jurisprudence. Increasingly, this court is called upon to resolve disputes concerning land use regulation, and the trend is likely to continue. A body of cogent, workable rules upon which regulators and landowners alike can rely is essential to the task.

In 1989, this court affirmed a holding of contempt against the City of Seattle for enforcement of the Housing Preservation Ordinance (HPO) after it had been ruled invalid by the Superior Court. *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 411, 780 P.2d 838 (1989). Once again, we are asked to review the actions of the City in a similar situation. Plaintiffs, Sintra, Inc., and its shareholders, Keith and Patty Hamack and Arthur and Susan Stanley (Sintra), appeal an order dismissing on summary judgment all of their claims against Seattle and four of its employees. Sintra claims that the City violated Sintra's federal rights to substantive due process and just compensation for a taking of its property, and that it is entitled to damages under 42 U.S.C. § 1983. We reverse the summary judgment in favor of the City and remand for further proceedings.

In September 1984, Sintra purchased the Larned Hotel on Westlake Avenue near downtown Seattle. The building was in an advanced state of disrepair and was almost vacant. The previous owners were unable to find new tenants for the building, despite their repeated attempts.

Sintra intended to renovate the building, and put retail shops on the ground floor and a bed and breakfast on the upper two floors. The building was purchased for $670,000 — $120,000 down and an installment note payable over 3 years. The terms of the financing were not favorable, but Sintra was unable to obtain alternative financing. After relocating the few remaining tenants, Sintra learned that an adult entertainment business might be moving into the adjacent building, and it became apprehensive about the possibilities for developing a bed and breakfast.

When the adult entertainment establishment opened its doors in July 1985, Sintra tried to sell the building. Sintra hired real estate broker Wade Cole, but his attempts were unsuccessful. Sintra and Cole also searched diligently for someone to develop low income housing at the building. In the meantime, Sintra defaulted on its installment note, and ceased making payments.

Eventually, Sintra concluded that the only profitable use to be made of the building was to convert it to a ministorage warehouse. On October 29, 1985, Sintra applied to the City for a master use permit for that purpose. Sintra was informed that a housing demolition fee of $219,840 would be required under the HPO for the change of use.[1] Seattle Municipal Code (SMC) 22.210.

Sintra applied for a variance from the HPO fee on November 6, 1985. On November 12, 1985, the sellers accelerated the note. The parties dispute the ensuing course of events. The City claims that Sintra failed to provide requested information until August 1986. Sintra, however, claims that despite repeated requests, the City failed to make any recommendation concerning relief until September 1986. The record supports Sintra's allegations of a continuing course of requests to the City to hasten the process. Many letters were directed to the Department of Community Development (DCD). At every turn, Sintra informed the City of its financial hardship and its desire to resolve the situation. Moreover, a memo from a city employee to David Moseley of DCD written in January 1986 indicates that a ministorage warehouse would be acceptable. Nevertheless, no recommendation was given. In a meeting with Sintra and its lawyers in March 1986, when Moseley was questioned about his reasons for delaying action, he responded: "What are you going to do, sue us?"

Although the City continually acknowledged that the Larned was entirely unsuitable for housing, it insisted that the HPO fee must be paid. In addition, the City required Sintra to show that any endeavor would be profitable if the HPO were not in effect.

---

[1]The HPO contained provisions requiring developers to either replace any low income housing they destroyed, or to pay a fee, based on the number of units, into a housing replacement fund. Seattle Municipal Code (SMC) 22.210.050, former SMC 22.210.120(A)(4). It also contained provisions requiring owners to pay tenant relocation fees, as well as providing notice and protection against anticipatory eviction. SMC 22.210.080-.100. Only the housing replacement provisions are at issue here.

In the meantime, events occurring on a different front became relevant. In July 1986, King County Superior Court found that the provisions of the HPO were an invalid tax unauthorized by statute. A permanent injunction was issued prohibiting the City from enforcing the HPO against another developer, San Telmo Associates. Although the decision was appealed, the City did not seek a stay of the injunction.

Finally, in September 1986, Moseley recommended that Sintra be granted conditional relief. Instead of simply waiving the HPO requirements, the conditional relief proposed by DCD would allow a variance for a ministorage warehouse, but would require full payment of the $219,840 fee if the use of the property were later changed. Sintra appealed, seeking a complete waiver of the fee. Defendant Holly Miller, Director of the City's Department of Construction and Land Use, adopted the recommendation given by Moseley in October 1986. Among the reasons given in a concurrent memo, a city employee noted that granting complete administrative relief would "establish an undesirable precedent". The memo also recognized that the City's law department recommended granting the variance and full relief from the fee.

Sintra appealed further to a hearing examiner, who reversed Miller's action and remanded. The examiner concluded that the conditional relief was not allowed under the SMC, but that Sintra should still be granted some form of partial relief so that it could use its property. Sintra did not appeal from this decision, which apparently was never carried out.

In April 1987, this court affirmed the trial court's order invalidating the housing replacement provisions of the HPO. *San Telmo Assocs. v. Seattle*, 108 Wn.2d 20, 25, 735 P.2d 673 (1987). We held that those requirements amounted to an unauthorized tax, as opposed to a regulation on development. *San Telmo*, at 24. We reasoned that shifting the social cost of development from the public at large to individual developers was a tax to "accomplish desired public benefits which cost money . . .' ". *San Telmo*, at 24 (quot-

ing *Hillis Homes, Inc. v. Snohomish Cy.*, 97 Wn.2d 804, 809, 650 P.2d 193 (1982)). Such a tax can only be levied when authorized by the Legislature; it is not a valid exercise of a city's police power. Moreover, under RCW 82.02.020, cities are expressly prohibited from taxing development. We also noted, in dicta, that the high fees involved could constitute a taking under the Washington Constitution. *San Telmo*, at 25.

On June 22, 1987, the City finally issued a change of use license and a master use permit to Sintra. But by then, Sintra claims, it was too late. The market opportunity was gone, and the building was in an advanced state of disrepair.

This court again considered the HPO in 1989, and struck down the tenant relocation provisions. *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 409, 780 P.2d 838 (1989). There, we held that RCW 82.02.020 also prohibited the imposition of the costs associated with tenant relocation, since those requirements constituted an indirect charge on development. *R/L Assocs.*, at 409. We declined to reach the issue of whether a taking had occurred, *R/L Assocs.*, at 410, and also refused to consider the substantive due process claim because plaintiff had failed to plead it properly and had not argued it to the trial court. *R/L Assocs.*, at 412.

In addition, this court found that the City's continued enforcement of the tenant assistance provisions after they had been ruled invalid by the Superior Court was contempt of court. *R/L Assocs.*, at 411. In response to the City's claim that the injunction applied only to R/L, we noted:

> [T]he City's argument would lead to the absurd conclusion that it is free to enforce the provisions of a facially invalid ordinance against the citizens of Seattle until and unless each aggrieved party brings its own action challenging the ordinance. . . .
>
> . . . .
> The City's decision to continue to enforce the HPO was deliberate. Two days after issuance of the injunction in this case, the City issued a news release that the city attorney had advised the Department of Construction and Land Use to continue to enforce the tenant relocation requirements. The

release stated that the City had been enjoined from enforcing this provision in one case. The courts need not tolerate this intentional violation of a valid judgment that prohibited the City from enforcing those provisions.

*R/L Assocs.*, at 411.

Sintra filed this action in October 1988. It claimed damages under 42 U.S.C. § 1983 for deprivation of its substantive due process rights and an unconstitutional taking. In addition, Sintra raised claims of inverse condemnation and wrongful interference with a business expectancy. It also requested attorney fees pursuant to 42 U.S.C. § 1988. In October 1989, in a separate action, the trial court rescinded the sale of the Larned as the remedy for misrepresentation. In the case at bar, cross motions for summary judgment were heard on February 2, 1990, and the trial court granted summary judgment to the City. Sintra appealed directly to this court.

### INTRODUCTION

This case primarily involves an action against the City of Seattle (City) and several officials under 42 U.S.C. § 1983. Essentially, § 1983 provides remedies not otherwise available in tort as a matter of federal statutory law. Sintra asserts two underlying causes of action: First, that its rights under the Fifth Amendment and Const. art. 1, § 16 (amend. 9) were violated; that is, it claims that its property was taken for public use without just compensation. Second, Sintra claims that it was denied substantive due process by the enforcement of the HPO.

The ordinance, as explained above, has been declared invalid on previous occasions, and that issue is not before the court here. However, because our prior cases were based on statutory grounds, the constitutional questions raised by Sintra have not been addressed. Sintra now seeks reversal of the summary judgment entered in favor of all defendants so that it may proceed to trial on money damages for the losses it suffered from the prior enforcement of the HPO.[2]

---

[2] In considering an appeal from an order of summary judgment, this court engages in the same inquiry as the trial court. *Marincovich v. Tarabochia*, 114

## 42 U.S.C. § 1983

■■■ We begin with a review of the civil rights statute. Under 42 U.S.C. § 1983, a plaintiff may recover money damages if it can show that it has been deprived of some federal right. State courts have concurrent jurisdiction to hear and decide § 1983 claims. Kenneth B. Bley, *Use of the Civil Rights Acts To Recover Money Damages for the Over-regulation of Land*, 14 Urb. Law. 223, 229 (1982). 42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the juris-diction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

There are only two essential elements in a § 1983 action: (1) the plaintiff must show that some person deprived it of a federal constitutional or statutory right; and (2) that person must have been acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981); *American Legion Post 32 v. Walla Walla*, 116 Wn.2d 1, 12, 802 P.2d 784 (1991); *Jordan v. Oakville*, 106 Wn.2d 122, 134, 720 P.2d 824 (1986). A local government is a "person" for purposes of § 1983. *Monell v. Department of Social Servs.*, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978); *Turngren v. King Cy.*, 104 Wn.2d 293, 311, 705 P.2d 258 (1985). Land use disputes, including takings claims, are an appropriate subject of § 1983 actions. *Front Royal & Warren Cy. Indus. Park Corp. v. Front Royal, Va.*, 708 F. Supp. 1477, 1483 (W.D. Va. 1989).

To state a cause of action, then, a plaintiff need only allege that (1) defendant acted under color of state law, and

---

Wn.2d 271, 274, 787 P.2d 562 (1990). The court considers all facts submitted and all reasonable inferences from the facts in a light most favorable to the nonmoving party, here, Sintra. *Marincovich*, at 274. The motion should be granted only when there is no genuine issue of material fact, and, as a matter of law, the moving party is entitled to judgment. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

(2) defendant's conduct deprived plaintiff of rights protected by the Constitution or laws of the United States. *Brower v. Wells*, 103 Wn.2d 96, 105, 690 P.2d 1144 (1984). The language contained in Sintra's complaint is more than sufficient to state a cause of action.[3]

### FEDERAL RIGHTS

■ We have previously held that land use regulations which too drastically curtail property owners' use of their property either may cause a constitutional taking or may constitute a denial of substantive due process. *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 329, 787 P.2d 907, *cert. denied*, 498 U.S. 911 (1990); *Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987) (*Orion II*), *cert. denied*, 486 U.S. 1022 (1988). *Presbytery* set forth the appropriate analysis for claims of overly severe land use regulation and delineated the tests to be used under the alternative analyses.

■ Under *Presbytery*, a court inquires, as a threshold matter, whether the challenged regulation safeguards the public interest in health, safety, the environment, or fiscal integrity. *Presbytery*, at 329. The court also asks if the regulation destroys one or more of the fundamental attributes of property ownership — the right to possess, to exclude others, and to dispose of property. *Presbytery*, at 329-30 (citing Richard L. Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. Puget Sound L. Rev. 339, 356 (1988-1989)). If no fundamental attribute of property is implicated, and the regulation protects the public

---

[3]The complaint alleges that: "The defendants herein have violated the Civil Rights of the plaintiffs by acting under color of law to enforce the HPO against plaintiffs in contravention of the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. 1983. Defendants have maliciously, recklessly and/or wantonly violated the constitutional rights of the plaintiffs by willfully enforcing an ordinance unconstitutional on its face even after the ordinance had been judicially declared invalid and/or continued enforcement had been permanently enjoined by judicial decree. Defendants have taken property from plaintiffs without Due Process nor have they paid Just Compensation." Clerk's Papers, at 7.

from a permissible harm, then a constitutional taking does not exist, but a substantive due process claim may still be available.

1. Takings Clause.

■ Sintra claims that the HPO prevented economically viable use of its land, and that its property was thus taken without just compensation. The Fifth Amendment provides in part: "[N]or shall private property be taken for public use, without just compensation." The restriction is applied to the states through the Fourteenth Amendment. *See Chicago, B. & Q. R.R. v. Chicago*, 166 U.S. 226, 41 L. Ed. 979, 17 S. Ct. 581 (1897). The Washington Constitution provides the same right.[4] In addition to outright physical appropriation of property, a taking can be accomplished by overregulation. A taking by regulation is often called an inverse condemnation, because the condemnation is found by the court *after* it has already been implemented by the regulation. Compensation is nonetheless required under the constitution if the property was taken for public use.

In *Presbytery of Seattle v. King Cy., supra*, this court clarified regulatory takings analysis and made plain the necessary steps to show that a taking had occurred. We

---

[4]Const. art. 1, § 16 (amend. 9) reads as follows:

"Private property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes. No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner, and no right-of-way shall be appropriated to the use of any corporation other than municipal until full compensation therefor be first made in money, or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived, as in other civil cases in courts of record, in the manner prescribed by law. Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public: *Provided*, that the taking of private property by the state for land reclamation and settlement purposes is hereby declared to be for public use."

employ the *Presbytery* framework here, and also refer to the rules set out by the United States Supreme Court in its 1987 trilogy of land use regulation cases: *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987); *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 96 L. Ed. 2d 250, 107 S. Ct. 2378 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987). This is for two reasons. First, the United States Constitution sets a minimum standard that prescribes that compensation must be given if a taking has occurred. Second, the issue before the court here concerns the deprivation of a federal right. State law may provide useful guidance in this determination, but federal law is ultimately controlling.[5]

In *Presbytery*, this court identified a threshold inquiry, to be decided prior to application of a takings analysis. If the challenged regulation is merely an exercise of the police power to safeguard the public interest in health, safety, the environment, or fiscal integrity, it is not a taking. *Presbytery*, at 329. The regulation may be a taking, however, if it "goes beyond preventing a public *harm* [to] actually enhance [] a publicly owned right in property."[6] The City relies heavily on its argument that Sintra has not met this threshold. It claims that the HPO was "enacted to prevent a public harm — displacement and homelessness of low-income tenants. By no stretch of the imagination did it enhance a publicly-owned interest in property." Brief of Respondent, at 37.

---

[5]*See also* Comment, *Taking Issue With Takings: Has the Washington State Supreme Court Gone Too Far?*, 66 Wash. L. Rev. 545 (1991).

[6]A regulation may also be a taking if it destroys one or more of the fundamental attributes of property ownership — the rights to possess, to dispose, or to exclude others. *Presbytery*, at 329-30; *Nollan*, 483 U.S. at 831. If an attribute of property is implicated, then it is likely that a taking has occurred. *Presbytery*, at 333 n.21 (citing *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980)).

A closer examination of the policies behind this threshold inquiry is necessary to resolve this question. The threshold test is designed to prevent undue chilling on legislative bodies' attempts to properly and carefully structure land use regulations which prevent public harms. *Orion* II, at 649. It is permissible for legislative bodies to wield police power to prevent activities which are similar to public nuisances. In *Keystone*, the Supreme Court discussed the difference between preventing harm and providing a benefit as follows:

> Under our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property. While each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others. . . . Long ago it was recognized that "all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community," and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it.
> . . . "[A] taking, is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest," and we recognized that this question "necessarily requires a weighing of private and public interests."

(Footnotes and citations omitted.) *Keystone*, at 491-92. Thus, land use regulation in the nature of restricting nuisance-like activity is permissible. But regulations which enhance public interests, and go beyond preventing harmful activity, may constitute a taking.

■ The regulatory scheme here goes beyond preventing harm. The HPO required that landowners who wished to alter the use of their property either replace the low-income housing or pay extremely high sums of money into a housing replacement fund. The harm sought to be prevented — people standing on the street corner with nowhere to go — was exceeded. The regulation required the improper additional step of providing new housing. Moreover, this burden was

unfairly allocated to individual property owners, rather than equally distributed among all citizens. This "goes beyond preventing a public harm". *Presbytery*, at 333.

■ In our previous decisions involving the HPO, we have said as much. In characterizing the HPO as an invalid tax, this court said:

> Requiring a developer either to construct low income housing or "contribute" to a fund for such housing gives the developer the option of paying a tax in kind or in money. . . . The City is . . . shifting the public responsibility of providing such housing to a limited segment of the population. This shifting is a tax, and pursuant to RCW 82.02.020, it cannot be allowed.

*San Telmo*, 108 Wn.2d at 24. Certainly, a regulatory scheme which is later determined to be a tax surpasses the proper scope of the City's police power.[7] We, therefore, can determine, as a matter of law, that the HPO was not a proper exercise of the City's police power, and *Presbytery*'s threshold requirements have been met here.

■ Our inquiry does not end with this determination, however. A regulation effects a taking of private property if "it 'does not substantially advance legitimate state interests, . . . or denies an owner economically viable use of his land.' " *Keystone*, 480 U.S. at 485 (quoting *Agins v. Tiburon*, 447 U.S. 255, 260, 65 L. Ed. 2d 106, 100 S. Ct. 2138 (1980)); *Nollan*, 483 U.S. at 834. In *Presbytery*, the court expounded on the precise application of this test.

First, if the regulation does not "substantially advance[] legitimate state interests", then it automatically constitutes

---

[7]Sintra relies on an alternative method of passing the threshold. If the public is actually provided with some use of the owner's land, such as an easement across it, a taking has almost certainly occurred. *Nollan*, at 831. This type of situation may properly be called an "exaction", as opposed to a "use", case. An analysis of an exaction case focuses on the *nexus* test set forth in *Nollan*. *Nollan*, at 841. Any conditions on development must serve the same purpose as the ban on development, or the regulation requiring those conditions will be a taking requiring compensation. *Nollan*, at 836-37. This type of inquiry is useful in determining if regulations which place conditions on development will be allowed. This is not an exaction case, however, because no physical invasion has been effected by the HPO. Thus, contrary to Sintra's arguments, the *Nollan* nexus test does not apply.

a taking. *Presbytery*, at 333; *see Nollan*, at 834-35. Here, the regulation must fairly be said to substantially advance a legitimate interest of the City in protecting its low income housing supply. If the regulation were valid, of course, the money raised could help to alleviate any housing shortage.

■ The question of economic viability of this particular property is more troublesome.[8] To determine if the regulation's economic impact is excessive, and thus constitutes a taking, we have suggested three factors to consider. The court should consider: "(1) the economic impact of the regulation on the property; (2) the extent of the regulation's interference with investment-backed expectations; and (3) the character of the government action." (Footnotes omitted.) *Presbytery*, at 335-36; *see also MacLeod v. County of Santa Clara*, 749 F.2d 541, 545-49 (9th Cir. 1984).

Our review of the record indicates that there are insufficient facts to evaluate either the first or second factor of the *Presbytery* analysis.[9] The extent of the economic impact of the HPO on Sintra's property is unclear. The City contends that any economic problems were of Sintra's own making, brought about by poor business decisions. Certainly, the extent that the regulation has interfered with the expectations of Sintra, as well as the question of whether those expectations were investment backed, has not been resolved, and is indeed hotly disputed. Again, the City claims that Sintra could not have found investors in its plan to turn the Larned into a ministorage warehouse, and never really expected to have a profitable business at that location. Sintra, however, argues

---

[8] A facial challenge is treated differently than one involving application of the regulation to specific property. *Presbytery*, at 333; *Keystone*, at 495. "[I]f the challenge to the regulation is a facial one, and if the landowner succeeds in showing that a regulation denies all economically viable use of any parcel of regulated property, then a constitutional taking has occurred." *Presbytery*, at 335; *cf. Robinson v. Seattle*, 119 Wn.2d 34, 830 P.2d 318 (1992). This is a stricter standard than that used for as-applied challenges. Since a specific property is involved, this is an as-applied challenge to the HPO.

[9] Determining if a taking has occurred is a question of fact. *Front Royal*, 708 F. Supp. at 1484.

that at least it would not have lost its investment entirely had it been allowed to proceed, and claims to be able to produce expert opinions in support of its position.

The third consideration — character of the government action — has been resolved by our earlier cases. That action has previously been determined to be in the nature of a tax. *San Telmo Assocs. v. Seattle, supra.* A city may, in the proper exercise of its police powers, impose limitations on development through regulation. *See Presbytery,* at 336 n.30. However, the HPO amounted to a cost-shifting device "under the guise of a regulation." *San Telmo,* 108 Wn.2d at 24. Thus, as above, the provisions of the HPO exceed the regulatory authority of the City. Without such authority, the government action here was essentially an appropriation. The third factor, then, indicates that a taking has occurred.

In sum, Sintra has shown that there are issues of material fact which must be resolved at trial. Thus, the order of the trial court granting summary judgment must be reversed. If Sintra is able to show at trial that the economic burden placed on its property was so great that no viable use was available, then compensation for that taking is available. *Presbytery,* at 336.

 Even a temporary taking is compensable under the Fifth Amendment, and Sintra need not prove that the property remained unusable after the HPO was invalidated. *First Lutheran,* 482 U.S. at 319; *Wheeler v. Pleasant Grove,* 833 F.2d 267, 270-71 (11th Cir. 1987). Because any taking occurred prior to Sintra obtaining a favorable rescission judgment against the original owners of its property, the City's argument that the result of Sintra's lawsuit against the sellers impacts our holding is incorrect. The City may therefore be liable to Sintra for a temporary taking. Damages would be measured from the time of the interference to the time the HPO was no longer enforced. *First Lutheran,* at 320-21.

 In addition, exhaustion of administrative remedies is necessary before a court can properly determine a takings claim. *Estate of Friedman v. Pierce Cy.,* 112 Wn.2d 68, 80,

768 P.2d 462 (1989). If the government entity responsible for administering the regulation in question has not yet reached a final decision, the claim may be premature as a matter of federal law. *Williamson Cy. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985). The Supreme Court has emphasized "an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." *MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 351, 91 L. Ed. 2d 285, 106 S. Ct. 2561 (1986). This requirement was imposed in *Presbytery* as well, and the rule was established that a landowner must exhaust administrative procedures in an attempt to secure permission to use the property. *Presbytery*, at 339.

On the record before the court, it appears that Sintra was diligent in pursuing administrative avenues. Sintra applied for necessary permits, and requested a variance from the HPO. It appealed adverse decisions, and communicated regularly with city officials. Although the City claims that Sintra was offered the opportunity to develop and rejected it, administrative remedies were at least attempted, and Sintra was informed that a $219,000 fee would be required. Moreover, the City did not raise exhaustion as a defense at the trial court. It may well be that additional efforts would have been futile, in light of the particular facts and circumstances of this case. *See Estate of Friedman*, at 80-81. However, because the trial court has not yet had the opportunity to resolve these questions, we remand the issue.[10]

In order for liability to arise under 42 U.S.C. § 1983, Sintra must also show that the takings claim is ripe for review. Under federal law, if a landowner fails to seek compensation through *state* judicial procedures, a takings claim

---

[10]The exhaustion issue is a question of law for the trial court to decide, although it does involve resolution of factual matters. *Estate of Friedman*, at 76. Additionally, even though this issue was not fully developed originally, it may be considered by the trial court on remand. *Cf. Bennett v. Hardy*, 113 Wn.2d 912, 918-19, 784 P.2d 1258 (1990).

is said to be not yet ripe. *Williamson*, at 194; *see also* Richard L. Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. Puget Sound L. Rev. 339, 357 (1988-1989). That is, as a matter of federal law, just compensation has not been denied, and so no federal right is involved, until the state has denied a plaintiff's cause of action in inverse condemnation. *Bateson v. Geisse*, 857 F.2d 1300, 1306 (9th Cir. 1988); *Abbiss v. Delaware Dep't of Transp.*, 712 F. Supp. 1159, 1162 (D. Del. 1989).

The federal rule was set forth in *Williamson*:

> If the government has provided an adequate process for obtaining compensation, and if resort to that process "yield[s] just compensation," then the property owner "has no claim against the Government" for a taking. . . . [I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.

(Citations omitted.) *Williamson*, 473 U.S. at 194-95. Here, the proper procedures and standards for a takings claim under state law are those set forth in *Presbytery* and explained above. Because we have been guided by federal law in our formulation, the inquiry is essentially the same. Nevertheless, the § 1983 claim here (a federal law claim) is unavailable to Sintra because it has not obtained a decision under state inverse condemnation law.

In sum, we hold that the regulation passes the threshold test of *Presbytery*, and should be subjected to a takings analysis under state law. We therefore remand for further proceedings, to examine whether the exhaustion requirement has been satisfied; and if so, to determine if a taking has in fact occurred, the time period of any taking, and appropriate damages.

2. Substantive Due Process.

Sintra claims that the continued enforcement of the HPO after it had been declared invalid arbitrarily deprived it of its property, and thus violated its right to due process. The Fourteenth Amendment provides: "[N]or shall any state deprive any person of life, liberty, or property, without due

process of law". This clause is a limit on a state's ability to pass unreasonable or irrational laws which deprive individuals of property rights. The inquiry here is distinct from the takings analysis, and a separate standard is used. *Nollan*, at 834 n.3. A substantive due process claim need not show that *no* viable use of the property remains, *Herrington v. County of Sonoma*, 834 F.2d 1488, 1498, 857 F.2d 567 (9th Cir. 1987), *cert. denied*, 489 U.S. 1090 (1989), but rather that any interference with property rights was irrational or arbitrary. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 49 L. Ed. 2d 752, 96 S. Ct. 2882 (1976). There is no question that Sintra has a property right which is implicated here. Instead, the issue centers around whether the HPO was a permissible regulation of that property.[11]

 To determine if a regulation results in a denial of due process, the court engages in a balancing test. We ask: "(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner." *Presbytery*, 114 Wn.2d at 330; *Orion II*, 109 Wn.2d at 646-47; *Lawton v. Steele*, 152 U.S. 133, 38 L. Ed. 385, 14 S. Ct. 499 (1894).

The first part of the test is not seriously disputed. The HPO was designed to preserve low income housing units. It attempted to achieve that purpose by offering property owners the option of replacing lost units themselves or contributing financially to a housing replacement fund. This is a legitimate goal. The second part — reasonable means — is highly suspect given the manner in which the City conducted itself. However, we need not decide if the regulation violates substantive due process on that basis alone.

---

[11]Exhaustion of administrative remedies is generally not required under § 1983. *Patsy v. Board of Regents*, 457 U.S. 496, 516, 73 L. Ed. 2d 172, 102 S. Ct. 2557 (1982). The particular exhaustion rules applied to the takings claim discussed above do not extend to the substantive due process claim. Moreover, unlike an action for just compensation under the takings clause, an action for a violation of substantive due process is ripe immediately (without regard to state remedies) because the harm occurs at the time of the violation. *See Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988).

██ The oppressive nature of the regulation is itself violative of due process. In *Presbytery*, the court listed several nonexclusive factors which should be considered in determining if a regulation is unduly oppressive, such as the nature of the harm, the availability and effectiveness of less drastic measures, and the economic loss suffered by the property owner. *Presbytery*, at 331. Additional factors involve consideration of both the public's interests and those of the regulated landowner, and include:

> On the public's side, the seriousness of the public problem, the extent to which the owner's land contributes to it, the degree to which the proposed regulation solves it and the feasibility of less oppressive solutions would all be relevant. On the owner's side, the amount and percentage of value loss, the extent of remaining uses, past, present and future uses, temporary or permanent nature of the regulation, the extent to which the owner should have anticipated such regulation and how feasible it is for the owner to alter present or currently planned uses.

*Presbytery*, at 331 (citing Stoebuck, San Diego Gas: *Problems, Pitfalls and a Better Way*, 25 Wash. U.J. Urb. & Contemp. L. 3, 33 (1983)).

In a strictly economic case, such as this one, certain of these factors are more relevant than others. In particular, Sintra's property cannot be singled out as contributing to the problem of homelessness in any pronounced way; the lack of low income housing was brought about by a great number of economic and social causes which cannot be attributed to an individual parcel of property. Moreover, the harm here can be solved by fiscal measures that would be less drastic in regard to a particular landowner. Additionally, the entire burden of the regulation falls on landowners who wish to develop their land. The economic impact on Sintra is enormous. It was asked to pay a $219,000 fee to develop a $670,000 piece of property. As we have previously noted in regard to the HPO, this is "shifting the public responsibility of providing such housing to a limited segment of the population." *San Telmo Assocs. v. Seattle*, 108 Wn.2d 20, 24, 735 P.2d 673 (1987). A regulation with such an unbalanced impact violates due process.

██ When money damages are sought, however, as opposed to a judgment invalidating the ordinance, an additional requirement has been imposed. In discussing the availability of § 1983, we have said that "a land use decision 'denies substantive due process only if it is invidious or irrational.' " *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 412, 780 P.2d 838 (1989) (quoting *Harding v. County of Door*, 870 F.2d 430, 431 (7th Cir. 1989)). Other courts have expressed the test differently, but conveyed essentially the same test. Relief is said to be available for § 1983 claims involving substantive due process only where there is a substantial infringement of state law prompted by animus directed at an individual or a group, or a "deliberate flouting of the law that trammels significant personal or property rights". *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir.), *cert. denied*, 488 U.S. 956 (1988). Arbitrary, irrational action on the part of regulators is sufficient to sustain a substantive due process claim under § 1983. *Coniston Corp. v. Hoffman Estates*, 844 F.2d 461, 467 (7th Cir. 1988); *Abbiss*, 712 F. Supp. at 1164.

The City claims that it acted rationally,[12] and relies on the rule that it cannot be liable for money damages for the mere enforcement of an unconstitutional or void ordinance. *R/L Assocs.*, at 412. In addition, the City argues that Sintra cannot show that it was singled out in any way. The City also claims that it was merely obeying city ordinances and acting on the advice of its attorney.

Sintra argues that the conduct complained of here was indeed irrational. Sintra first applied for a master use permit in October 1985, and was told in November 1985 that it would need a change of use license under the HPO, which it could obtain by payment of a $219,000 fee. In July 1986, the King County Superior Court entered a declaratory judgment holding that the HPO was invalid. Although the City did not seek a stay or order of supersedeas, it continued to

---

[12]The City also argues that Sintra did not plead irrational or invidious conduct, but this is incorrect. Sintra's allegation that the City and its employees acted willfully, wantonly and/or recklessly is sufficient.

enforce the provisions of the HPO until this court affirmed that judgment in April 1987. Thus, at the time that conditional relief was offered to Sintra (September 1986), the HPO had already been found invalid.

In *San Telmo*, this court agreed that the HPO was invalid as an unauthorized tax. There was no statutory authority for such a tax and, in fact, such authority was precluded by a statute preventing any tax on the development of land. RCW 82.02.020; *San Telmo*, 108 Wn.2d at 23-24. The tenant assistance provisions of the HPO were also found to be invalid by this court. *R/L Assocs.*, at 409. In addition, we held that the City's continued enforcement of the tenant assistance provisions in the face of the superior court order was contempt of court. *R/L Assocs.*, at 411.

We hold that Sintra may proceed on its § 1983 claim against the City. The reasoning we applied in *R/L Associates* could be applied here as well. Sintra argues that the City acted irrationally and invidiously, and "deliberately flouted" the law, because it continued enforcement of an ordinance that it knew to be invalid. Intentional violations of court orders cannot be tolerated. Respect for the rule of law lies at the heart of due process, and disregard of that law by government can only be considered violative of that right. We are persuaded that Sintra's allegations merit further inquiry into the facts, and should not have been disposed of on summary judgment.

Thus, we reverse the trial court's award of summary judgment. We hold that, as a matter of law, the regulation violates the substantive due process test set forth in *Presbytery*. A determination of whether the City's conduct violated Sintra's due process rights under § 1983 is still required. Because this is a § 1983 action, money damages are available.[13] We remand the case for further proceedings in accordance with this opinion.

---

[13]In *Presbytery*, this court held that the only remedy for a substantive due process violation in the land use context is the invalidation of the regulation. *Presbytery*, at 332. No § 1983 claims were considered by the court, however.

## INDIVIDUAL DEFENDANTS

The City argues that, as a matter of law, its individual employees are entitled to immunity from Sintra's claims. Local government bodies are not immune from a § 1983 suit merely because the alleged violation involves a discretionary decision or a governmental function. *Turngren v. King Cy.*, 104 Wn.2d 293, 311, 705 P.2d 258 (1985). Absolute immunity is not available for administrative acts of local officials. *Creekside Assocs., Inc. v. Wood Dale*, 684 F. Supp. 201, 205-06 (N.D. Ill. 1988). However, qualified immunity has been found to exist. Government officials performing discretionary functions are shielded from all liability for civil damages if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982); *Front Royal*, 708 F. Supp. at 1480. The issue of immunity is a question of law. *Mitchell v. Forsyth*, 472 U.S. 511, 528, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985).

The standard set forth in *Harlow* supplants the good faith standard previously applied. *Cf. Wood v. Strickland*, 420 U.S. 308, 322, 43 L. Ed. 2d 214, 95 S. Ct. 992 (1975); *Harper v. State*, 110 Wn.2d 873, 884, 759 P.2d 358 (1988), *rev'd on other grounds*, 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990). Qualified immunity is not available unless the government official can show that his or her conduct was objectively legally reasonable. *Anderson v. Creighton*, 483 U.S. 635, 641, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). Thus, a subjective, good faith belief that the conduct complained of was not unconstitutional will not suffice to prove immunity; the defendant must show that his or her conduct was objectively reasonable.

The determination of whether a particular right is "clearly established" is a complex one. Substantive due process claims have previously been found to be "well established" by the federal court. *Bateson v. Geisse*, 857 F.2d 1300, 1304-05 (9th Cir. 1988); *Creekside*, at 206. But it is not clear

that this pronouncement ends our inquiry. The Supreme
Court has addressed this very problem:

> [T]he right the official is alleged to have violated must have
> been "clearly established" in a more particularized, and hence
> more relevant, sense: The contours of the right must be suffi-
> ciently clear that a reasonable official would understand that
> what he is doing violates that right. This is not to say that an
> official action is protected by qualified immunity unless the
> very action in question has previously been held unlawful, . . .
> but it is to say that in the light of pre-existing law the unlaw-
> fulness must be apparent.

(Citations omitted.) *Anderson*, 483 U.S. at 640.

 There are insufficient facts on the record before us to
decide if any or all of the individual defendants are entitled
to qualified immunity.[14] A reasonable person should have
known that enforcing the HPO in contravention of a court
order prohibiting enforcement would constitute a denial of
someone's rights. As outlined above, various city employees
informed their superiors, defendants here, that relief should
be granted in this case. In addition, Sintra consistently
asserted that its rights were being violated by the City's
actions, thus putting the defendants on notice that it
intended to pursue those rights. But it is not at all clear
what precise knowledge was held by the particular individu-
als. The City rests on its assertion that the conduct was
reasonable, because the City's law department had recom-
mended continued enforcement of the HPO. This single fact
is not a sufficient basis for the immunity sought here.
Because we are unable to determine if immunity is war-
ranted here, we must remand this issue to the trial court.

We acknowledge the difficulty of the task: on remand, the
trial court must determine, as a matter of law, if the
individual defendants acted in an objectively reasonable
way, and are therefore entitled to the protection of qualified
immunity. That determination should be made on summary
judgment. *Harlow*, 457 U.S. at 818. In doing so, the court

---

[14]Our decision here applies only to the substantive due process action.
Individuals are not amenable to suit in inverse condemnation, and the § 1983
action has been resolved as it applies to the taking claim.

should be guided by the underlying principles expressed in *Harlow*:

> By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences."

(Footnotes and citations omitted.) *Harlow*, 457 U.S. at 819.

If the trial court decides that the individual defendants are not entitled to immunity, then the determination of whether the conduct at issue here violated the substantive due process rights of Sintra must be decided at trial. That does not necessarily entail a verdict in Sintra's favor, however. Again, to obtain a favorable verdict, Sintra must show first, that the regulation was violative of due process, and second, that the conduct here was irrational or invidious.

We have already determined that the regulation violated Sintra's due process rights. The remaining inquiry, then, is similar to that presented in considering immunity: whether the individual defendants acted irrationally. It may be that the question can only be settled by a factfinder. The reasonableness of the defendants' conduct can only be determined based on a clear understanding of the particular facts known by the individuals at any given time.[15]

## OTHER CLAIMS

■ Sintra also raised a claim of wrongful interference with a business expectancy. Although the City asserts that

---

[15]Unlike the current case, in *Robinson v. Seattle*, 119 Wn.2d 34, 830 P.2d 318 (1992), the knowledge held by individuals is clearly on the record. Here, however, the only direct evidence in the record is a memo to David Moseley dated October 15, 1986, from a city employee noting that the ordinance had been "overruled" by the court.

the claim was not properly pleaded, the complaint and attached claim for damages provide a "short and plain statement of the claim". CR 8(a)(1). To make out a claim for wrongful interference, Sintra must prove:

1. The existence of a valid contractual relationship or business expectancy;
2. That defendants had knowledge of that relationship;
3. An intentional interference inducing or causing a breach or termination of the relationship or expectancy;
4. That defendants interfered for an improper purpose or used improper means; and
5. Resultant damages.

*Pleas v. Seattle*, 112 Wn.2d 794, 800, 804, 774 P.2d 1158 (1989).

Here, Sintra has made sufficient allegations to survive a motion for summary judgment. Sintra had taken steps to convert its property into a ministorage warehouse, and had pursued necessary administrative procedures. Moreover, as explained above, there are many areas of disputed fact: the existence of a valid expectancy, the extent of the economic interference, the causal relationship between the City's interference and damages to Sintra, and the extent of such damages. In any event, the means employed by the City to prevent development of Sintra's property — the enforcement of an invalid ordinance in the face of a court order — were improper. We reverse the trial court's award of summary judgment on the wrongful interference claim.[16]

Finally, Sintra contends that if it prevails, it is entitled to reasonable attorney fees under 42 U.S.C. § 1988 and RCW 8.25.075(3). The trial court granted fees to the City. Since we hold that Sintra should be allowed to proceed, the award

---

[16]In a related matter, Sintra claims that an affidavit submitted to the trial court 3 days after the summary judgment hearing should not have been considered. The affidavit explained the City's position regarding the tortious interference claim. It is within the discretion of the trial court to consider affidavits which are filed late. *Rainier Nat'l Bank v. Inland Mach. Co.*, 29 Wn. App. 725, 730, 631 P.2d 389 (1981).

of attorney fees to the City should be vacated. Any award of attorney fees should await resolution of the case. *See, e.g., State v. Buckley*, 18 Wn. App. 798, 801, 572 P.2d 730 (1977).

CONCLUSION

In sum, we hold the following:

1. The order of summary judgment in favor of the City is reversed, and Sintra may go forward on its claim of a taking without just compensation, or inverse condemnation. Moreover, we hold that the threshold requirements of *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 329, 787 P.2d 907, *cert. denied*, 498 U.S. 911 (1990) have been met. However, because it is not yet ripe, the related claim under 42 U.S.C. § 1983 was properly dismissed. We remand for further proceedings consistent with our opinion.

2. The order of summary judgment in favor of the City is reversed on Sintra's claim against the City for a violation of substantive due process under 42 U.S.C. § 1983. We hold that the HPO violated substantive due process, and remand for a determination of whether the City's conduct was irrational or invidious.

3. The order of summary judgment dismissing Sintra's claims against individual defendants is reversed, and we remand for the trial court to consider whether qualified immunity attaches. Absent immunity, Sintra may proceed against the individual defendants for deprivation of its right to substantive due process under 42 U.S.C. § 1983.

4. We reverse the order for summary judgment in favor of defendants as it pertains to the wrongful interference claim.

5. We reverse the award of attorney's fees and costs to the City, and reserve any award of fees pending resolution of the remaining claims.

DORE, C.J., and BRACHTENBACH, DOLLIVER, ANDERSEN, SMITH, and GUY, JJ., concur.

UTTER, J. (concurring) — Although I agree with the majority opinion, I write separately to develop more fully the application of the law of exhaustion, finality and ripeness to the 42 U.S.C. § 1983 takings claim and inverse condemnation claim in this case. Clarity and correct use of terminology is important in this complex area of the law. More is at stake than "mere jurisprudential fastidiousness." Wright, *The Timing of Judicial Review of Administrative Decisions: The Use and Abuse of Overlapping Doctrines*, 11 Am. J. Trial Advoc. 83 (1987).

I

EXHAUSTION, FINALITY, AND RIPENESS

One commentator succinctly described the rationale behind the procedural requirements that must be satisfied before a takings claim can be considered:

> The procedural hurdles that landowners and other regulated interests must clear to raise just compensation claims are a result of the unique nature of the clause. Under the just compensation clause, governments are not prohibited from taking private property; rather they are required to provide compensation when their actions constitute a taking. Thus, the Court treats as relevant whether there are administrative and judicial mechanisms through which landowners and other regulated interests may obtain approval for their desired use of their property or, failing that, receive proper compensation.

(Footnote omitted.) 1 S. Steinglass, *Section 1983 Litigation in State Courts* § 3.4(d)(1), at 3-35 (1989). In doctrinal terms, those procedural hurdles are ripeness, exhaustion of administrative remedies, and finality.

The doctrines of ripeness and exhaustion both deal with the timing of judicial review, and have similar purposes:

> Both doctrines serve agency autonomy and judicial economy by allowing most administrative proceedings to conclude prior to judicial intervention and, by deferring intervention in this manner, courts allow agencies to perform their functions and assist their own later review of the agency's action.

Power, *Help Is Sometimes Close at Hand: The Exhaustion Problem and the Ripeness Solution*, 1987 U. Ill. L. Rev. 547,

612. In the past we have recognized that exhaustion and ripeness are related concepts. *Estate of Friedman v. Pierce Cy.*, 112 Wn.2d 68, 76, 768 P.2d 462 (1989). When we considered an inverse condemnation action in *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 339, 787 P.2d 907, *cert. denied*, 498 U.S. 911 (1990), we used the terms exhaustion and ripeness almost interchangeably. A third doctrine, finality, is related to ripeness and exhaustion: "Problems of finality are in the area where the law of exhaustion joins or overlaps with the law of ripeness." 4 K. Davis, *Administrative Law Treatise* § 26:10, at 458 (2d ed. 1983). Finality is not so much a separate requirement as an element common to both exhaustion and ripeness. Power, 1987 U. Ill. L. Rev. at 618.

## II
## THE SECTION 1983 CLAIM

Although absolute doctrinal clarity may not be necessary in all cases, it is important in a § 1983 claim that we carefully distinguish between these doctrines. In *Williamson Cy. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985), the United States Supreme Court grappled with these legal concepts in a case involving a § 1983 takings claim. The Court declined to reach the takings issue because the case was not yet ripe. The Court stated two reasons for the absence of ripeness:

> Because respondent has not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property, nor utilized the procedures Tennessee provides for obtaining just compensation, respondent's claim is not ripe.

*Williamson*, 473 U.S. at 186. Thus, for a § 1983 case to be ripe, a plaintiff must seek a final administrative decision as well as pursue state procedures to obtain just compensation.

The Court, however, differentiated ripeness and finality from exhaustion of administrative remedies. The plaintiff claimed that it was not required to seek variances from regulations because its suit was based on § 1983, and there

is no requirement that a plaintiff exhaust administrative remedies in such a suit. *Williamson*, 473 U.S. at 192 (citing *Patsy v. Board of Regents*, 457 U.S. 496, 73 L. Ed. 2d 172, 102 S. Ct. 2557 (1982)). The Court, however, differentiated finality and exhaustion:

> While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

*Williamson*, 473 U.S. at 193.[17] The Court found that there was not a final agency decision because the plaintiff had not sought variances from the Commission. It stated, however, that finality would not have required appeals, for example, to the Board of Zoning Appeals. *Williamson*, 473 U.S. at 193.

Thus, when a plaintiff brings a § 1983 takings action, we should employ the 2-part test used in *Williamson* to determine whether the action is ripe: (1) Has there been final agency action on the application of the regulation? and (2) Has the plaintiff utilized state procedures for obtaining compensation? The majority correctly concludes that Sintra has not utilized state procedures for obtaining compensation. On that basis alone, this case is not ripe for purposes of § 1983. Therefore, we need not reach the issue of whether there was final agency action to resolve the § 1983 ripeness issue.

---

[17]The Court's categorical distinction between exhaustion and finality in *Williamson* is, however, questionable. The Court in *Williamson* unduly restricted the exhaustion of administrative remedies doctrine by limiting its exhaustion of administrative appeals. Power, *Help Is Sometimes Close at Hand: The Exhaustion Problem and the Ripeness Solution*, 1987 U. Ill. L. Rev. 547, 613 n.294. A better approach is to recognize, as Professor Davis does, that finality is an aspect of both ripeness and exhaustion, and that issues of finality arise at the intersection of these two doctrines. 4 K. Davis, *Administrative Law Treatise* § 25:1, at 350, § 26:10, at 458 (2d ed. 1983).

## III
### The Inverse Condemnation Claim

There remains, however, Sintra's inverse condemnation claim. Unlike the § 1983 claim, it is appropriate for us to use the term "exhaustion of administrative remedies" in considering that claim. Moreover, we should not construe this term narrowly to mean only whether Sintra has pursued its administrative appeals, as the Court in *Williamson* did in the § 1983 context. Instead, the exhaustion inquiry should be "how far a party must pursue an administrative remedy before going to court". 4 K. Davis, *Administrative Law Treatise* § 25:1, at 350 (2d ed. 1983). The two reasons for the exhaustion doctrine we listed in *Estate of Friedman v. Pierce Cy.*, 112 Wn.2d 68, 77-79, 768 P.2d 462 (1989) should be assessed in determining whether Sintra has exhausted its administrative remedies. First, we noted the policies favoring the doctrine of exhaustion. Those policies are to

> (1) insure against premature interruption of the administrative process, (2) allow the agency to develop the necessary factual background on which to base a decision, (3) allow the exercise of agency expertise [in its area], (4) provide a more efficient process and allow the agency to correct its own mistake, and (5) insure that individuals are not encouraged to ignore [its] procedures by resort[ing] to the courts.

*Estate of Friedman*, 112 Wn.2d at 78 (quoting *Orion Corp. v. State*, 103 Wn.2d 441, 456-57, 693 P.2d 1369 (1985) (citing *South Hollywood Hills Citizens Ass'n v. King Cy.*, 101 Wn.2d 68, 73-74, 677 P.2d 114 (1984))). The second reason, which is "at least as important" is that it is difficult to assess a takings claim when administrative remedies have not been exhausted. *Estate of Friedman*, 112 Wn.2d at 78. Issues central to the takings inquiry, such as the economic impact of the regulation, or its affect on investment backed expectations, may be impossible to assess if a plaintiff has not sought administrative relief and there is no final agency action. The trial court should consider the reasons we listed

34

in *Estate of Friedman* for the exhaustion doctrine when it considers the exhaustion issue.

JOHNSON, J., concurs with UTTER, J.

Reconsideration denied June 17, 1992.