144 P.3d 276 (2006)
PACIFIC NORTHWEST SHOOTING PARK ASSOCIATION, a Washington nonprofit corporation, and Lawrence J. Witt, Petitioners,
v.
CITY OF SEQUIM, a municipal corporation within the State of Washington, and Sequim Police Chief Bryon Nelson, Respondents.
No. 76109-4.
Supreme Court of Washington, En Banc.
Argued September 27, 2005.
Decided October 12, 2006.
*277 John D. Black, John D. Black, PLLC, Port Angeles, WA, Richard M. Stephens, Groen Stephens & Klinge LLP, Bellevue, WA, for Petitioners.
Robert L. Christie, Christie Law Group, PLLC, Seattle, WA, for Respondents.
FAIRHURST, J.
¶ 1 Petitioners Pacific Northwest Shooting Park Association (PNSPA), a nonprofit corporation, and Lawrence Witt, a federally licensed firearms collector, seek reversal of an unpublished Court of Appeals decision affirming the trial court's grant of summary judgment to the city of Sequim. PNSPA brought suit against the city and its police chief, Byron Nelson, alleging tortious interference with a contractual relationship or business expectancy between PNSPA and the city to use the city's convention center for a gun show. It also claimed that the city's actions violated RCW 9.41.290 and .300. PNSPA later argued that the city interfered *278 with its business expectancies with vendors and the general public, but it failed to amend its complaint to add this claim. We hold that the question of interference with PNSPA's contractual relationships or business expectancies with vendors and the general public is not properly before us and do not decide the question. We also find that the city did not violate either RCW 9.41.290 or .300. Accordingly, we affirm the Court of Appeals.

I. FACTS
¶ 2 On April 3, 2002, PNSPA applied to the city for a temporary use permit to hold a gun show at the Guy Cole Convention Center from April 13 to April 14, 2002. The purpose stated on the application was for a gun show that was to include sales and "Display of Merchandise." Suppl. Clerk's Papers (SCP) at 8. On the application form, PNSPA was required to indicate what the property would be used for and the application stated that approval was subject to any attached conditions. The city distributed the application form, along with a separate memorandum, to Clallam County Fire District No. 3, the police department, public works, and the city manager soliciting their comments or conditions. The public works department and the city manager each returned a copy of the separate memorandum with handwritten comments and questions. The fire district and the police department provided separate memoranda with their conditions.
¶ 3 An undated document entitled "Special Conditions of Approval" was attached to the permit application. SCP at 13. It listed five conditions.[1] Only the first of these "special" conditions, the attached conditions from the police department, is at issue here.
¶ 4 Chief Nelson sent two memoranda to the city planning department, one dated April 9, 2002, and a second dated April 11, 2002, that superseded the April 9, 2002, memorandum. Only the second memorandum is at issue. April 11, 2002, is the date on which the city gave final approval to the permit application. The April 11, 2002, memorandum had 15 conditions, only three of which are being contested. The conditions required that (1) only dealers could "dispose of" handguns and then only to state residents, (2) only dealers could purchase or acquire firearms from unlicensed individuals, and (3) unlicensed dealers could not sell firearms at all. SCP at 18.
¶ 5 It is not clear from the record whether PNSPA received a copy of the April 9, 2002, memorandum, nor is it clear whether PNSPA received copies of the approved permit with all the referenced attachments on April 11, 2002, the date it was approved. Nevertheless, it seems clear that the conditions were imposed as part of a routine internal process for approval of applications to use the convention center, and PNSPA was aware in advance that the city might impose conditions on that use. Further, PNSPA does not allege that it failed to receive timely the documents containing the permit conditions. PNSPA merely alleges that Chief Nelson acted improperly by coming to the convention center on April 12, 2002, the day before the show, and "announcing" the conditions of use to the participants. Clerk's Papers (CP) at 80. As a result of Chief Nelson's "announcement," PNSPA claims that many vendors packed up and left the show and attendance by the public was significantly lower than expected. Id.

II. PROCEDURAL HISTORY
¶ 6 PNSPA filed suit against the city and Chief Nelson, as an employee and agent acting on behalf of the city, claiming that Chief Nelson tortiously interfered with the contractual relationship between PNSPA and the city. The complaint did not specifically allege interference with business expectancies between PNSPA and gun show participants, although it did refer to the negative effect Chief Nelson's actions had on "sellers and potential gun-show participants." CP at 81. *279 PNSPA further alleged that the city violated RCW 9.41.290 and .300 by imposing unauthorized restrictions on private party gun sales at the gun show. Witt, a member of PNSPA, filed suit soon after alleging tortious interference with an unexplained relationship between himself and the city. SCP at 63. PNSPA and Witt subsequently moved for consolidation of their cases which was granted.
¶ 7 The city moved for summary judgment, arguing that the claim of interference with a contractual relationship or business expectancy failed because the plaintiffs failed to establish the elements of the tort. It argued principally that the defendants were parties to the contract and could not be liable for interference with their own contract. The city further argued that plaintiffs' second claim, violation of RCW 9.41.290 and .300, failed because there is no private cause of action under RCW 9.41.300 and neither statute was violated. In its response PNSPA specifically alleged, for the first time, that the city had interfered with its expectancies with vendors and the general public. PNSPA attached only the declaration of Louis Huber, PNSPA's president, for this claim. PNSPA also conceded that its contract with the city had not been interfered with per se. In reply, the city contested PNSPA's new argument and responded that PNSPA did not present any evidence supporting expectancies with the vendors and general public.
¶ 8 PNSPA filed a motion for leave to amend its complaint to add a claim for breach of contract, but it never filed an amended complaint. PNSPA did not request leave to amend the tortious interference claim to include a reference to the expectancies between PNSPA, the vendors, and the general public.
¶ 9 Following oral argument, the trial court granted summary judgment to the city. Although the trial court order shows that it considered the motion for leave to amend, and the affidavit in support thereof, the record does not reflect that any action was taken on the motion to amend. The trial court dismissed both the claims of tortious interference with a contractual relationship or business expectancy and violation of RCW 9.41.290 and .300 in their entirety with prejudice. In a memorandum opinion, the trial court held that: (1) "[t]he City passed no ordinances contrary to RCW 9.41.290," (2) "[t]he conditions imposed by Police Chief Nelson were a part of the contract between the City and Plaintiff Shooting Park," and (3) "[p]laintiffs presented no evidence that those conditions were improper under the police powers of the City or that the Defendants in any way breached the contract in any manner." CP at 9.
¶ 10 PNSPA appealed to the Court of Appeals, Division Two, arguing that the city interfered with the business expectancies between PNSPA, the vendors, and the general public and that the city acted improperly by violating RCW 9.41.290 and .300. The city responded that PNSPA had pleaded only interference with the contractual relationship between the city and PNSPAnot business expectancies with vendors and the general public. The city also argued that, in any event, PNSPA failed to present admissible evidence supporting expectancies with the vendors and general public.
¶ 11 In an unpublished opinion, the Court of Appeals affirmed the trial court, holding that (1) PNSPA's argument that the city and Chief Nelson had interfered with a contract between the city and PNSPA failed because a party cannot tortiously interfere with its own contract; (2) PNSPA's argument that the city and Chief Nelson unlawfully interfered with a business expectancy between it and the gun show vendors failed because PNSPA did not explain why Chief Nelson's actions were unlawful and Chief Nelson had merely imposed and enforced valid permit conditions; (3) PNSPA's argument that RCW 9.41.290 preempted the city "from enacting laws or ordinances on the possession of firearms" failed because the city did not enact a law or ordinance and, even if it had, nothing in the statute creates a private cause of action; and (4) PNSPA's argument that the permit conditions imposed by the city through Chief Nelson violated RCW 9.41.290 and .300 failed because nothing in either statute affects permit conditions and, even if it did, neither statute creates a private cause *280 of action. Pac. Nw. Shooting Park Ass'n v. City of Sequim, noted at 123 Wash.App. 1014, 2004 WL 1987254 at *2, 2004 Wash. App. LEXIS 2023, at *6.
¶ 12 PNSPA and Witt sought review of only two issues: (1) whether the city tortiously interfered with contractual relationships or business expectancies between PNSPA, Witt, the vendors, and the general public, and (2) whether the city violated RCW 9.41.290 and .300. We granted review. Pac. Nw. Shooting Park Ass'n v. City of Sequim, 154 Wash.2d 1019, 120 P.3d 953 (2005).

III. ISSUES
A. Did the city tortiously interfere with contractual relationships or business expectancies between PNSPA, Witt, the vendors, and the general public?
B. Did the city violate RCW 9.41.290 or .300?

IV. ANALYSIS
¶ 13 We engage in the same inquiry as the trial court when we review an order on summary judgment, treating all facts and reasonable inferences from the facts in the light most favorable to the nonmoving party. Folsom v. Burger King, 135 Wash.2d 658, 663, 958 P.2d 301 (1998). The burden is on the party moving for summary judgment to demonstrate that there are no genuine issues of material fact. Id. A party may move for summary judgment by setting out its own version of the facts or by alleging that the nonmoving party failed to present sufficient evidence to support its case. Guile v. Ballard Cmty. Hosp., 70 Wash.App. 18, 21, 851 P.2d 689 (1993). If the moving party uses the latter method, it must "identify those portions of the record, together with the affidavits, if any, which . . . demonstrate the absence of a genuine issue of material fact." Id. at 22, 851 P.2d 689. Once the moving party has met its burden, the burden shifts to the nonmoving party to present admissible evidence demonstrating the existence of a genuine issue of material fact. Vallandigham v. Clover Park Sch. Dist. No. 400, 154 Wash.2d 16, 27, 109 P.3d 805 (2005). If the nonmoving party cannot meet that burden, summary judgment is appropriate. Id.
A. Did the city tortiously interfere?
¶ 14 A party claiming tortious interference with a contractual relationship or business expectancy must prove five elements:
(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.
Leingang v. Pierce County Med. Bureau, Inc., 131 Wash.2d 133, 157, 930 P.2d 288 (1997).
¶ 15 Before we begin our substantive analysis, we must determine whether PNSPA's claim of tortious interference with contractual relationships and business expectancies with its vendors and the general public is properly before us. The difficulty is that PNSPA's original complaint alleged only that the city and Chief Nelson had interfered with the contractual relationship that PNSPA had with the city. It subsequently argued in its motion for summary judgment to the trial court, and in briefs to the Court of Appeals and to this court, that it has always claimed that the city interfered with business expectancies it had with vendors and the public.
¶ 16 The city, on the other hand, has steadfastly contended that PNSPA's only claim was for interference with a contractual relationship between the city and PNSPA and that a party cannot interfere with its own contract. However, in rebuttal to PNSPA's new arguments, the city argued that, in any event, PNSPA did not present sufficient facts to show interference with the expectancies with vendors and the general public.
¶ 17 Under CR 15, after an opposing party has filed an answer, a party may amend its pleading only by leave of the court, and the court is instructed to freely grant leave when justice so requires. Bank of Am. v. Hubert, 153 Wash.2d 102, 122, 101 P.3d 409 (2004). *281 PNSPA did not introduce its claim of interference with its business expectancies with vendors and the general public until it responded to the city's motion for summary judgment. PNSPA requested leave to amend its complaint, however, it did so only to add a claim for breach of contract, not to amend the interference claim. But PNSPA now urges this court to consider its new interference argument as if that were what it had argued all along.
¶ 18 While inexpert pleadings may survive a summary judgment motion, insufficient pleadings cannot. Lewis v. Bell, 45 Wash.App. 192, 197, 724 P.2d 425 (1986). Washington is a notice pleading state and merely requires a simple concise statement of the claim and the relief sought. CR 8(a). Complaints that fail to give the opposing party fair notice of the claim asserted are insufficient. Dewey v. Tacoma Sch. Dist. No. 10, 95 Wash.App. 18, 26, 974 P.2d 847 (1999) (stating that a party who fails to plead a cause of action "cannot finesse the issue by later inserting the theory into trial briefs and contending it was in the case all along."); Lundberg v. Coleman, 115 Wash.App. 172, 180, 60 P.3d 595 (2002). In its complaint, PNSPA did not refer to a relationship it had with vendors or the general public. CP at 81-82. The complaint alluded to losses that PNSPA and other gun show participants had sustained, but it did not tie those losses to specific relationships between PNSPA and identifiable third parties.[2]Id. Thus, PNSPA failed to give the city fair notice of the basis for its claim.[3]
¶ 19 We hold that the question of interference with PNSPA's contractual relationships or business expectancies with vendors and the general public is not properly before us and do not decide it. Accordingly, we affirm the Court of Appeals.
B. Did the city violate RCW 9.41.290 or .300?
¶ 20 PNSPA contends that the city's permit conditions were "improper" because, under RCW 9.41.290, the State has fully occupied the field of firearms regulation and any municipal action that regulates sales of firearms necessarily violates the preemption clause. PNSPA further argues that the city's conditions constituted an unlawful restriction under RCW 9.41.300.
¶ 21 The city responds that the plain language of the preemption clause limits its reach to enactment of laws and ordinances. It argues that the text of the clause should be read in the context in which it was enacted, reasoning that the purpose was to eliminate inconsistencies in criminal firearms regulations. The city further contends that the reference to laws and ordinances is limited to laws of application to the general public. Regarding RCW 9.41.300, the city merely observes that it did not place any restrictions on possession of firearms, but it does not indicate whether a restriction on sales would violate the statute.
¶ 22 In interpreting a statute, our primary goal is to determine and give effect to the legislature's intent and purpose in creating the statute. Am. Cont'l Ins. Co. v. Steen, 151 Wash.2d 512, 518, 91 P.3d 864 (2004) We generally begin our analysis with *282 the text of the statute. Id. If the statute is clear and unambiguous on its face, we determine its meaning only from the language of the statute and do not resort to statutory construction principles. Id. A statute is ambiguous only if it can be reasonably interpreted in more than one way, not merely because other possible interpretations exist. Id.
¶ 23 RCW 9.41.290 states:
The state of Washington hereby fully occupies and preempts the entire field of firearms regulation within the boundaries of the state, including the registration, licensing, possession, purchase, sale, acquisition, transfer, discharge, and transportation of firearms, or any other element relating to firearms or parts thereof, including ammunition and reloader components. Cities, towns, and counties or other municipalities may enact only those laws and ordinances relating to firearms that are specifically authorized by state law, as in RCW 9.41.300, and are consistent with this chapter. Such local ordinances shall have the same penalty as provided for by state law. Local laws and ordinances that are inconsistent with, more restrictive than, or exceed the requirements of state law shall not be enacted and are preempted and repealed, regardless of the nature of the code, charter, or home rule status of such city, town, county, or municipality.
(Emphasis added.)
¶ 24 RCW 9.41.300(2)(b)(ii) states:
(2) Cities, towns, counties, and other municipalities may enact laws and ordinances:
. . . .
(b) Restricting the possession of firearms in any stadium or convention center, operated by a city, town, county, or other municipality, except that such restrictions shall not apply to:
. . . .
(ii) Any showing, demonstration, or lecture involving the exhibition of firearms.
(Emphasis added.)
¶ 25 The text of RCW 9.41.290 states that the state of Washington has fully occupied and preempted the field of firearms regulation. That preemption covers regulations related to possession, purchase, sale, acquisition, and transfer of firearms, all of which are potentially at issue at a gun show. However, RCW 9.41.290 and .300 together explicitly allow cities, towns, counties, and municipalities to enact laws and ordinances restricting firearm possession in stadiums and convention centers they operate. Logic dictates that one must possess a firearm in order to "show" and "sell" a firearm. It follows that if the city had authority to regulate possession of firearms in its convention center under RCW 9.41.300, it also had authority to regulate sales of firearms under RCW 9.41.300. The authority to regulate sales of firearms flowed from its authority to regulate possession of firearms under RCW 9.41.300.[4]
¶ 26 Further, PNSPA's gun show does not qualify as an exception under RCW 9.41.300(2)(b)(ii). It was not a "showing, demonstration, or lecture involving the exhibition of firearms." RCW 9.41.300(2)(b)(ii) (emphasis added). PNSPA's complaint clearly states that gun collectors, dealers, and buyers were invited to "sell, trade and buy" the firearms.[5] CP at 80. An "exhibition" *283 is defined as "a display or show where the display itself is the chief object and from which the exhibitor derives or expects to derive a profit." Webster's Third New International Dictionary 796 (2002) (emphasis added). Because the city had authority to regulate possession, and by logical inference sales, of firearms and the gun show did not qualify as an exhibition, the city did not violate RCW 9.41.300 by imposing permit conditions on the use of its convention center.
¶ 27 However, even if we were to conclude that the city could not regulate firearm sales under RCW 9.41.300 and the gun show qualified as an exhibition, we would still not conclude that RCW 9.41.290 preempted the city's permit conditions.
¶ 28 This court has already examined the text of the preemption clause in RCW 9.41.290 and considered its scope in a case involving restrictions imposed on firearm possession in the workplace by a municipal employer. Cherry v. Mun. of Metro. Seattle, 116 Wash.2d 794, 802, 808 P.2d 746 (1991). We determined that the purpose of the statute was unclear, at least with respect to the internal policies of municipal employers, and conducted an examination of legislative intent. Id. at 800, 808 P.2d 746. We concluded that the central purpose of RCW 9.41.290 was to eliminate conflicting municipal criminal codes and to "advance uniformity in criminal firearms regulation." Id. at 801, 808 P.2d 746 (emphasis added). We also found the penal nature of the Firearms Act, chapter 9.41 RCW, to be particularly significant, reasoning that the clause was not intended to interfere with a public employer's ability to establish workplace policies.[6]Id. at 800-01, 808 P.2d 746. We construed the clause to apply only to laws or regulations of general application. Id. We reasoned that it could not be construed to prohibit a municipality from doing something that a private employer was not prohibited from doing because such a conclusion would result in an overly strained interpretation. Id. at 802, 808 P.2d 746. Therefore, Cherry supports the general proposition that when a municipality acts in a capacity that is comparable to that of a private party, the preemption clause does not apply.
¶ 29 A municipality acts in a proprietary capacity when it "acts as the proprietor of a business enterprise for the private advantage of the [municipality]" and it may "exercise its business powers in much the same way as a private individual or corporation." Hite v. Pub. Util. Dist. No. 2 of Grant County, 112 Wash.2d 456, 459, 772 P.2d 481 (1989); Branson v. Port of Seattle, 152 Wash.2d 862, 870, 101 P.3d 67 (2004). When acting in a proprietary capacity, a city may enter into any contract "`which is necessary to render the system efficient and beneficial to the public.'" Hite, 112 Wash.2d at 460, 772 P.2d 481 (quoting Puget Sound Power & Light Co. v. Pub. Util. Dist. No. 1, 17 Wash. App. 861, 864, 565 P.2d 1221 (1977)); see also Stover v. Winston Bros. Co., 185 Wash. 416, 422, 55 P.2d 821 (1936). By issuing a temporary use permit, the city was leasing its property to PNSPA and acting in its private capacity as a property owner.
¶ 30 The preemption clause does not prohibit a private property owner from imposing conditions on the sale of firearms on his or her property. RCW 9.41.290. Applying our reasoning in Cherry, it follows that a municipal property owner like a private property owner may impose conditions related to firearms for the use of its property in order to protect its property interests. For the same reason that a municipal employer may enact policies regarding possession of firearms in the workplace because a private employer may do so, a municipal property owner should be allowed to impose conditions related to sales of firearms on its property if a private property owner may impose them. The critical point is that the conditions the city imposed related to a permit for private use of its property. They were not laws or regulations of application to the general public.
*284 ¶ 31 We find that the city did not violate either RCW 9.41.290 or .300.

V. CONCLUSION
¶ 32 We hold that PNSPA failed to give the city fair notice of the basis for its claim of interference with its contractual relationships and business expectancies with vendors and the general public and the claim is not properly before us. We also hold that the city did not violate RCW 9.41.290 or .300. We affirm the Court of Appeals.
WE CONCUR: ALEXANDER, C.J., C. JOHNSON, MADSEN, BRIDGE and OWENS, JJ.
SANDERS, J. (dissenting).
¶ 33 The majority concludes Pacific Northwest Shooting Park Association (PNSPA) insufficiently pleaded a claim of tortious interference with a business expectancy because its complaints do not specifically state it expected to do business with vendors and the general public. The majority is wrong. A pleading is sufficient so long as it provides notice of the general nature of the claim asserted. Dumas v. Gagner, 137 Wash.2d 268, 282, 971 P.2d 17 (1999). The nature of PNSPA's claim is pellucid and its complaints entirely adequate. It alleges tortious interference with its expectation of hosting a gun show. No additional specificity is required.
¶ 34 Furthermore, the majority concludes RCW 9.41.300, which prohibits municipalities from regulating gun shows, permits municipalities to regulate gun shows. I am nonplussed. The statute means what it says. City of Sequim lacked authority to regulate PNSPA's gun show.
I. PNSPA Sufficiently Pleaded Tortious Interference with a Business Expectancy
¶ 35 A complaint must provide "(1) a short and plain statement of the claim showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which he deems himself entitled." CR 8(a). Under these "liberal rules of procedure," a complaint is sufficient so long as it provides notice "of the general nature of the claim asserted." Lightner v. Balow, 59 Wash.2d 856, 858, 370 P.2d 982 (1962). See also Berge v. Gorton, 88 Wash.2d 756, 762, 567 P.2d 187 (1977) (holding complaint must "contain direct allegations sufficient to give notice to the court and the opponent of the nature of the plaintiff's claim"). By this standard, PNSPA's complaints are quite sufficient.
¶ 36 In order to state a claim of tortious interference with a business expectancy, a party must allege:
1. The existence of a valid contractual relationship or business expectancy;
2. That defendants had knowledge of that relationship;
3. An intentional interference inducing or causing a breach or termination of the relationship or expectancy;
4. That defendants interfered for an improper purpose or used improper means; and
5. Resultant damages.
Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 28, 119 Wash.2d 1, 829 P.2d 765 (1992) (citing Pleas v. City of Seattle, 112 Wash.2d 794, 800, 804, 774 P.2d 1158 (1989)). PNSPA's complaints allege Byron Nelson and the city of Sequim knew it expected to host a gun show, intentionally and improperly interfered with its ability to host a gun show, and caused its gun show to fail. These allegations are quite sufficient to plead a claim of tortious interference with a business expectancy.
¶ 37 The majority incorrectly asserts a party pleading a claim of tortious interference with a business expectancy must name the specific parties with whom it expected to do business. It cites no authority for this proposition. And none exists.
¶ 38 The cause of action for tortious interference with a business expectancy vindicates "`society's interest'" in "`reasonable expectations of economic advantage'" and "`affording to the individual a fair opportunity to conduct his legitimate business affairs without interruption from others except in so far as such interferences are sanctioned by the `rules of the game' which society has adopted.'" Scymanski v. Dufault, 80 *285 Wash.2d 77, 84, 491 P.2d 1050 (1971) (quoting 1 Fowler V. Harper & Fleming James, Jr., The Law of Torts § 6.11, at 510 (1956)). "A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value," including a party's prospective customers. Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Group, Inc., 114 Wash.App. 151, 158, 52 P.3d 30 (2002) (citing Restatement (Second) of Torts § 766B cmt. c (1979)). "All that is needed is a relationship between parties contemplating a contract, with at least a reasonable expectancy of fruition. And this relationship must be known, or reasonably apparent, to the interferor." Scymanski, 80 Wash.2d at 84-85, 491 P.2d 1050. PNSPA's complaints allege prospective contractual relations with "gun collectors, dealers and buyers from all over the northwest." PNSPA's Complaint for Damages for Tort of Interference with Business Relationship; and Violation of RCW 9.41.300, at 2. And PNSPA alleges Nelson was aware of those prospective contractual relations. Id. at 3. Accordingly, PNSPA sufficiently pleaded the existence of a business expectancy.
II. PNSPA Pleaded Facts Sufficient to State a Claim for Tortious Interference with a Business Expectancy
¶ 39 The record contains ample evidence supporting every element of tortious interference with a business expectancy. PNSPA's affidavits state Nelson was aware it expected to host a gun show attended by members of the public. And they state Nelson intentionally and improperly interfered with those expectations, causing the gun show to fail. Because these affidavits "set forth specific facts showing that there is a genuine issue for trial," CR 56(e), summary judgment is inappropriate.
III. Municipalities Lack Authority to Regulate Gun Shows
¶ 40 Curiously, the majority concludes RCW 9.41.300, which explicitly and specifically prohibits municipalities from regulating gun shows on municipal property, permits municipalities to regulate gun shows on municipal property. The statute is neither ambiguous nor unclear. Under RCW 9.41.300(2)(b)(ii), municipalities may not regulate the possession of firearms at a "showing, demonstration, or lecture involving the exhibition of firearms." The majority concludes a gun show is not an "exhibition of firearms." Majority at 282. I find this incredible. The legislature obviously intended this statute to exempt gun shows from municipal regulation. Only the majority's linguistic somersaults make it mean the opposite of what it says.
¶ 41 Perhaps the majority simply rejects such "primitive faith in the inherent potency and inherent meaning of words." Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 563-64, 442 P.2d 641, 643-44 (1968) (footnote omitted). But its humpty-dumptyism starkly illustrates the counter-majoritarian difficulty: "which is to be master," the legislature or the court? Lewis Carroll, Through the Looking-glass and What Alice Found There 124 (1871) (William Morrow & Co.1993). When a statute is unambiguous, and unambiguously within the power of the legislature to enact, the answer is clear. The court cannot substitute its preferences for those of the legislature.
¶ 42 I dissent.
J.M. JOHNSON, J. (concurrence in dissent).
¶ 43 I concur with the dissent; however, I write separately in order to briefly clarify Washington law regarding firearms and their sale, which was misstated or improperly applied by the police chief here.[1] This is particularly important as the Washington constitutional right "of the individual citizen to bear arms" could have also been implicated in this case.[2] Wash. Const. art. I, § 24. *286 Whether this right includes a corollary constitutional right to sell or trade firearms need not be decided since Washington statutory law, correctly understood, allows the sales. I concur with the dissent.
¶ 44 Police Chief Nelson made a significant legal error in his April 11, 2002 memo, which he personally distributed. Suppl. Clerk's Papers (SCP) at 17. The memo restricted gun sales at the show in a manner not allowed by Washington law. It is difficult to find that a law enforcement officer, who surely had access to the RCWs, could incorrectly state the law in good faith.[3]
¶ 45 The memo stated that "Sales by persons who are not licensed dealers shall not be allowed." SCP at 18. Interestingly, the memo then contradicted itself and stated that "Dealers ONLY may purchase/acquire firearms from an unlicensed individual." Id. However, Washington law does not restrict the sale or purchase of guns to licensed dealers.
¶ 46 RCW 9.41.010(10) defines a "dealer" as
a person engaged in the business of selling firearms at wholesale or retail who has, or is required to have, a federal firearms license under 18 U.S.C. Sec. 923(a). A person who does not have, and is not required to have, a federal firearms license under 18 U.S.C. Sec. 923(a), is not a dealer if that person makes only occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or sells all or part of his or her personal collection of firearms.
The statute itself expressly acknowledges that persons who are not dealers may make "occasional sales, exchanges, or purchases" of firearms under state law. The city of Sequim or its police chief may not be more restrictive than Washington law regarding the sale of firearms. See RCW 9.41.290. It was error for Police Chief Nelson to impose a more restrictive measure on the sale of firearms than Washington law requires. Under Washington law, persons who are not dealers may "occasionally" sell guns at gun shows without a license.
¶ 47 I concur with the dissent.
CHAMBERS, J., concurs.
NOTES
[1] The first condition referred to separate attached conditions from the police department. The second condition required that PNSPA comply with city sign regulations. The third condition referred to separate attached conditions from the fire district. The fourth condition required that the city be listed as the point of sale for all transactions. The fifth condition required PNSPA to contact the planning, public works, and police departments to verify that it was in compliance before the show.
[2] The dissent claims that the majority erroneously requires a party pleading a claim of tortious interference with a business expectancy to "name the specific parties with whom it expected to do business." Dissent at 2. In a tortious interference claim, a claimant is required to show a "relationship between parties contemplating a contract." Scymanski v. Dufault, 80 Wash.2d 77, 84-85, 491 P.2d 1050 (1971). To show a relationship between parties contemplating a contract, it follows that we must know the parties' identities. We are correct in concluding that PNSPA must show a specific relationship between it and identifiable third parties. In its complaint, PNSPA explicitly specified only that it had a contractual relationship with the city. PNSPA noted that it invited gun collectors, dealers, and buyers to buy, sell, and trade firearms, but PNSPA did not indicate it had a relationship with the gun collectors, dealers, and buyers. An invitation to some amorphous group of people does not magically become a relationship merely because some members of the group might attend the gun show.
[3] The city also argues that Witt abandoned his claims because petitioners' briefs failed to refer to him on appeal. We agree. Because petitioners have largely ignored Witt's claims and no facts have been presented that specifically relate to Witt, we conclude his claims have been abandoned.
[4] Contrary to the dissent's claim, we do not hold that RCW 9.41.300 authorizes municipalities to "regulate gun shows." Dissent at 1, 4. We merely draw a logical inference based on RCW 9.41.300's explicit language authorizing municipalities to regulate possession of firearms on city property. The city's authority does not depend on the type of activity PNSPA intended to pursue on the city's property. If PNSPA planned to have a book sale, it likely would not have been affected by the city's authority to restrict possession of firearms on its property. It just so happens that PNSPA sought to hold an event whose sole purpose was firearm buying and selling, and the city had express authority to restrict firearm possession on its property.
[5] The dissent states that RCW 9.41.300 "explicitly and specifically prohibits municipalities from regulating gun shows on municipal property," but in order to reach this conclusion it must completely ignore the last three words of RCW 9.41.300(2)(b)(ii). Dissent at 4. RCW 9.41.300(2)(b)(ii) prohibits cities only from restricting showings, demonstrations, or lectures involving "exhibition of firearms." (Emphasis added.) The dissent fails to explain how a sale qualifies as an exhibition.
[6] We note that the legislature placed the preemption clause in Title 9 of the Washington criminal code rather than in Title 35, which governs activities of cities and towns, or Title 36, which governs activities of counties. Although this placement is not conclusive of the legislature's intent, it supports our analysis in Cherry regarding the penal focus of the preemption clause.
[1] Federal law is not addressed, although the city's police chief also claimed to have reviewed such law. See infra note 3.
[2] Washington Constitution article I, section 24 protects this "right of the individual citizen to bear arms" in terms more absolute than the United States Constitution. See State v. Rupe, 101 Wash.2d 664, 706, 683 P.2d 571 (1984).
[3] The chief claimed he issued the April 11 memo after "reviewing application for a gun show . . . as well as Federal Statutes." SCP at 17.