# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| MISTI BELL, individually, and as guardian for her daughter, C.B., a minor, and SCOTT BELL, individually, | No.  48063-8-II |
| Appellants, | |
| v. | |
| NORTHWEST SCHOOL OF INNOVATIVE LEARNING, | PUBLISHED OPINION |
| Respondent, | |
| BETHEL SCHOOL DISTRICT, a public corporation, individually; BHC FAIRFAX HOSPITAL INC., a Tennessee for profit corporation d/b/a FAIRFAX HOSPITAL BEHAVIORAL HEALTH SERVICES; and UNIVERSAL HEALTH SERVICES, INC., a Delaware for profit corporation, | |
| Defendants. | |

JOHANSON, J.  —  CB[1] appeals the superior court's grant of summary judgment dismissing her negligence claims against Northwest School of Innovative Learning (NW School).  The superior court ruled that NW School owed no duty to CB.  We agree and affirm.

---

[1] We use initials to protect confidentiality.  *See* Gen. Order 2011-1 of Division II, *In re the Use of Initials or Pseudonyms for Child Witnesses in Sex Crime Cases* (Wash. Ct. App.), http://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders&div=II.

FACTS

CB was a 15-year-old special education student. Because the Bethel School District (District) was unable to meet CB's special education needs, it contracted with NW School to provide special education services to her.

In March 2012, at the end of NW School's educational day, CB boarded a District school bus. The District school bus picked up students from the sidewalk adjoining a city street in front of NW School. CB was agitated and began a verbal altercation with another student and the District's bus driver, Norma Henderson. Through her window, Henderson told a NW School employee outside the bus that "[CB] is not in a good mood" and that CB was "going to start a conflict" with the other student. Ex. 1, at 13:49:14-20.[2] James Tate, a NW School Behavior Intervention Specialist, came to the bus doorway and spoke to CB. According to Tate, when he approached the bus, he observed two agitated students, but the situation looked "contained" and was not "out of control." Clerk's Papers (CP) at 707. He dealt with the students on the bus as he would in a classroom to try to deescalate the situation. Tate testified that he understood that once students were on the bus, they became the District's responsibility.

After Tate left, CB and the other student sat quietly in their seats. Henderson radioed that she was "having an issue" and that she was planning to take off, but that if she had problems she would call 911. Ex. 1, at 13:52:32. CB asked to go back into the school. CB and Henderson got off the bus and tried to reenter NW School so CB could call her dad for a ride, but the school doors were locked. There was a small doorbell on the NW School building, CB rang it and "could see

---

[2] Exhibit 1 is the video footage of the bus incident.

shadows and people moving back there," but no one came to the door. CP at 545. She felt frustrated and got back on the bus.

After they returned to the bus, CB asked Henderson to call her dad or her social worker. Henderson told CB that her only options according to the District's emergency protocol were for CB to remain on the bus or for Henderson to call 911. This agitated CB, who stated that if the driver called 911, CB would be taken to jail. CB got off the bus. Henderson then notified her dispatcher and called 911. After CB got off the bus, she walked to the public library where she met Michael Bond, a stranger. CB agreed to go to Bond's apartment. At the apartment, Bond sexually assaulted her.

The District's policy was that "'[w]hen a teacher, coach, or other certified staff member is assigned to accompany students on a bus, such person shall be primarily responsible for behavior of the students in his/her charge. The bus driver shall have final authority and responsibility regarding the safe transport of students.'" CP at 28. District bus drivers take responsibility for students once a student gets on the bus. Additionally, before the bus leaves a student at the school, the bus driver must wait for a representative from the school to come get the student or the bus driver must walk the student back into the school and connect them with a school representative in a "positive handoff" so the student would not be left unsupervised. CP at 34.[3]

---

[3] In their briefing to this court, the parties did not dispute that the District provided bus transportation for CB. However, at oral argument, CB for the first time claimed that NW School was responsible for transportation. We do not consider issues raised for the first time in oral argument. RAP 12.1(a).

## II. Procedural History and Summary Judgment Hearing

Based on Bond's sexual assault, CB brought negligence and gross negligence claims against NW School and the District. NW School and the District moved for summary judgment on all claims.[4] NW School argued in relevant part that summary judgment was appropriate because, as a matter of law, NW School owed CB no duty once CB left NW School's custody.

In opposition, CB argued that NW School had a duty to protect CB from reasonably foreseeable harm. CB's expert, Dr. Edward Dragan, Ed.D., opined that both the District and NW School were aware of CB's mental illnesses and disabilities. According to Dragan, the District and NW School's knowledge placed a "direct burden and responsibility on both defendants to address [CB's] manifestations" to protect her and others from harm that could come from CB's inability to make rational decisions. CP at 838. Dragan opined that NW School's duty to promote its students' safety and welfare does not terminate at the bus door, and thus NW School had a duty to monitor and provide assistance to the bus driver until the bus departed. He noted that the bus did not leave the NW School loading area until after CB got off the bus.

The superior court concluded as a matter of law that the District, not NW School, had custody of CB at the time she left the bus and thereafter suffered harm. The superior court denied summary judgment regarding the claims against the District. The superior court granted summary judgment and dismissed the claims against NW School. CB appeals the summary judgment ruling in favor of NW School.

---

[4] The District was ultimately dismissed from the suit.

## ANALYSIS

### PRINCIPLES OF LAW

We review an order of summary judgment de novo and perform the same inquiry as the superior court. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is appropriate where the pleadings, admissions on file, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c).

To prevail in a negligence suit, a party must first show the existence of a duty to the plaintiff. *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 429, 378 P.3d 162 (2016). "Whether a duty exists is a question of law for the court." *N.L.*, 186 Wn.2d at 429. Generally, there is no duty to prevent a third person from causing physical injury to another, but such a duty can arise when a special relationship exists between the defendant and either the third party or the foreseeable victim of a third party's conduct. *N.L.*, 186 Wn.2d at 429-30. School districts and school children have a special relationship that can create a duty because children are compelled to attend school. *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 319, 255 P.2d 360 (1953). A school district has a duty to take certain precautions to protect its pupils in its custody from dangers reasonably anticipated. *McLeod*, 42 Wn.2d at 320.

In this relationship, the protective custody of school staff is mandatorily substituted for that of the parent. *N.L.*, 186 Wn.2d at 430-31. At the heart of a special protective relationship is entrustment of a vulnerable individual. *HBH v. State*, 197 Wn. App. 77, 91, 387 P.3d 1093 (2016). Thus, a special relationship depends on the establishment of entrustment, not custody, but custody may define whether there was a duty. *HBH*, 197 Wn. App. at 90-91.

A district's duty to exercise reasonable care may end when the student leaves the district's custody, but a district's liability for a breach of duty while a student was in its custody is not cut off just because a harm did not occur until later. *N.L.*, 186 Wn.2d at 432. Thus, where a duty arises and a breach of that duty occurs while a student is in a district's custody, then whether the scope of that duty extends to incidents off campus will depend on whether such incidents were foreseeable to the district. *See N.L.*, 186 Wn.2d at 435. If a defendant does not owe a duty, then further analysis regarding negligence is unnecessary. *Minahan v. W. Wash. Fair Ass'n*, 117 Wn. App. 881, 890, 73 P.3d 1019 (2003).

DUTY

The issue here is whether NW School owed CB a duty. CB argues that whether NW School had a duty to her should not depend on whether NW School had custody of CB, but should be determined based on the "foreseeability of the harm." Br. of Appellant at 23. CB further argues that *N.L.* "plainly rejects" NW School's argument that foreseeability alone does not create a duty by the school district without custody of the student. Reply Br. of Appellant at 4. Thus, CB argues that under *N.L.*, "foreseeability is the most important variable in determining the duty of a school district" and that *N.L.* is determinative in this case. Reply Br. of Appellant at 1. We agree that *N.L.* controls, but we disagree with CB's remaining arguments.

In *N.L.*, the 14-year-old victim met Nicholas Clark, age 18, at school track practice. 186 Wn.2d at 425. Both were students in the District. *N.L.*, 186 Wn.2d at 425. Neither N.L. nor any responsible adult on the field knew that Clark was a registered sex offender who had previously sexually assaulted a young girl about N.L.'s age. *N.L.*, 186 Wn.2d at 425-26. Clark's school principal knew of Clark's sex offender status, but the principal took no responsive action. *N.L.*,

6

186 Wn.2d at 426. Clark persuaded N.L. to leave campus and raped her. *N.L.*, 186 Wn.2d at 426. N.L. sued the District for negligence. *N.L.*, 186 Wn.2d at 426.

Our Supreme Court stated that the issue was "whether [the] District's *duty to N.L. ended* when she left campus." *N.L.*, 186 Wn.2d at 426 (emphasis added). The *N.L.* court held that a "district's *duty* to exercise reasonable care *might end when the student leaves its custody*," but a *district's liability* for a breach of duty "*while the student was in its custody* would [not] be cut off merely because the harm did not occur until later." 186 Wn.2d at 432 (first emphasis in original; emphasis added).

The *N.L.* court thus concluded that the duty to N.L. "arose while N.L. and Clark were in the district's custody," as did the alleged breach when the District failed to take steps to protect students from Clark while on school property. 186 Wn.2d at 432. In response to the District's arguments that it had no duty because the eventual harm to N.L. was unforeseeable, the court concluded that whether N.L.'s injury "fell within the scope" of the District's duty was a question of fact for the jury. *N.L.*, 186 Wn.2d at 436.

The mere fact that an *injury* occurs off campus is not determinative of whether a duty exists; rather, the relevant inquiry is to the location of the negligence rather than the location of the injury. *N.L.*, 186 Wn.2d at 435. Contrary to CB's contentions, *N.L.* does not establish that a school district's duty to its students arises from foreseeability alone regardless of whether the student is in the district's custody. Rather, *N.L.* established that where a duty arises and a breach of that duty occurs while a student *is in a school district's custody*, then whether the *scope of that duty extends* to incidents off campus will depend on whether such incidents were foreseeable to

the school district. *N.L.*, 186 Wn.2d at 435. Accordingly, we reject CB's attempt to extend *N.L.*'s holding.

CB argues that the location of the negligence—where NW School had a duty—was "*to properly supervise and protect [CB]* in the loading area and outside the school doors of [NW School]." Br. of Appellant at 22. CB argues that while she was in NW School's bus loading area, "[NW School] staff watched and did nothing as [CB's] behaviors escalated," that CB was having a "mental health crisis" known to NW School, and that when CB tried to reenter the school, "[NW School]'s reaction was to keep the doors closed." Br. of Appellant at 27, 23, 33. These arguments fail.

NW School, as the party moving for summary judgment, has the burden to demonstrate that there are no genuine issues of material fact. *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 350, 144 P.3d 276 (2006); CR 56. NW School argues that the evidence showed that CB was in the District's custody from the time she got on the bus initially until she walked off the bus and the driver called 911. At that point, when CB got off the bus the second time, NW School argues that CB was no longer in NW School's custody and it no longer owed CB a duty of care. Thus, the material fact at issue is who had custody of CB.

On the issue of the custody of CB, NW School submitted evidence that CB was on the District's school bus. NW School also submitted evidence that it is the District's policy that once a student enters a District school bus, the District's school bus driver has responsibility for the student and has final authority regarding the students' transport. Before the bus driver can leave a student at NW School, if the student cannot be transported on the bus, the bus driver must wait for a representative from NW School to come get the student or the bus driver must walk the student

back into school and connect them with a school representative in a "positive handoff" so that the student is not left unsupervised. CP at 34. Finally, Tate spoke to CB on the bus, confirmed the situation seemed contained, and he left the bus.

Thus, NW School submitted evidence to establish that CB was on the District school bus and, pursuant to District policy, CB was no longer in NW School's custody and care. These facts do not raise any material dispute that CB was in the District's custody and not in NW School's custody.

The burden shifts to the nonmoving party, here CB, to present admissible evidence demonstrating the existence of a genuine issue of material fact. *Pac. Nw.*, 158 Wn.2d at 351. If the nonmoving party cannot meet that burden, summary judgment is appropriate as a matter of law. *Pac. Nw.*, 158 Wn.2d at 351. CB must set forth specific evidentiary facts to show factual issues remain and she cannot meet her burden by relying on mere allegations. CR 56(e). Here, CB does not meet her burden.

It is undisputed that CB entered a District school bus after school. Tate approached the bus and calmed CB down, but Tate did not assume custody of CB on behalf of NW School. Soon after, CB and the District's school bus driver, Henderson, tried to reenter NW School so CB could call her dad for a ride, but the doors were locked. They returned and got on the bus, and CB asked Henderson to call her dad or her social worker. Henderson told CB that her only options according to the District's emergency protocol were for CB to remain on the bus or for Henderson to call 911. CB left the bus. Henderson called 911.

These facts show that CB was in the District's custody at least from the time CB entered the bus the second time until she walked off the bus and the driver called 911. There was never a

9

"positive handoff" from the District bus driver to a NW School staff member. Thus, there is no question of fact here: the District had custody of CB for the purpose of determining who owed CB a duty of care.

CB argues, without legal authority, that NW School owed her a duty because they knew she was "in the midst of a known-mental health crisis while in the loading area and outside the doors of the school." Br. of Appellant at 23. But as NW School argues, CB's focus on the fact that the bus never left the school bus loading area is a "red-herring." Br. of Resp't at 31. First, there is no "loading area" on the NW School campus, the District school bus picked up students from the sidewalk adjoining a city street in front of NW School. CP at 710. And regardless of the location of the "loading area," the fact that the bus did not leave the "loading area" does not establish NW School had custody of CB or owed her a duty of care. Custody is not determined by physical location alone. Although the bus did not leave the sidewalk in front of NW School, that fact is not legally material to the determination of CB's custodial control. Second, even assuming NW School knew CB was in a "mental health crisis," CB does not explain how that fact establishes that NW School owed her a duty of care.

Because CB entered the District's school bus and there was a "positive handoff" from NW School to the District school bus driver, the District had custody of CB and owed CB a duty of care. CB fails to meet her burden to set forth evidence creating an issue of fact that NW School, and not the District, had custody of CB once she was on the District school bus. Since NW School did not owe a duty to CB at the time she left the bus, further analysis regarding NW School's negligence is unnecessary. *Minahan*, 117 Wn. App. at 890. Summary judgment was properly granted as a matter of law.

No. 48063-8-II

Affirmed.

_____
JOHANSON, J.

We concur:

_____
WORSWICK, P.J.

_____
SUTTON, J.

11