**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

DIMENSION TOWNHOUSES, LLC, a
Washington Limited Liability Company,

                Respondent,

     v.

LEGANIEDS, LLC, a Washington
Limited Liability Company, JASON
LEGAT and JOHN/JANE DOE LEGAT,
spouses, and the marital community
composed thereof, and DANIEL
NIEDER and JOHN/JANE DOE
NIEDER, spouses, and the marital
community comprised thereof,

                Appellants.

No. 84969-7-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — Dimension Townhomes (Dimension) applied to the City of Burien to subdivide its property. Because of confusion over lot lines and an adjacent parcel, the City put Dimension's application on hold. Leganieds, the owner of the adjacent parcel that was also subject to an easement serving Dimension's property, submitted comments to the City including claiming ownership in part of Dimension's property. After the City considered Dimension's application withdrawn, Dimension sued Leganieds for tortious interference, declaratory judgment, and injunctive relief.

Leganieds moved to dismiss Dimension's lawsuit in part based on the Uniform Public Expression Protection Act (UPEPA), chapter 4.105 RCW. Leganieds appeals the trial court's decision denying its motion to dismiss Dimension's tortious interference claim under UPEPA.

We reverse and remand for the trial court to dismiss Dimension's tortious interference claim and award Leganieds its attorney fees.

I

A

This litigation concerns neighboring properties in Burien, Washington that were once combined. Background information on the history of these properties is set out in WT Properties v. Leganieds, 195 Wn. App. 344, 382 P.3d 31 (2016), and provided below:

> In early 2006, Binod Prasad and Basant Prasad owned the property that is involved in this litigation. They are the predecessors in interest to WT Properties and Leganieds. These parties each now own parts of the property formerly owned by the Prasads. Rehabitat Northwest Inc., who is not a party to this litigation, owned at times relevant to this dispute other parts of the property formerly owned by the Prasads.
>
> In October 2006, the Prasads conveyed to Rehabitat property described as "Parcel I" and "Parcel II" in the diagram that follows. The Prasads expressly reserved in the deed to Rehabitat an easement from 170th Street for ingress, egress, and utilities in these two parcels. This is the Access Strip. The easement is for the benefit of the property—"Parcel A" and "Parcel B"—to the south on the diagram that follows.
>
> On February 14, 2007, the Prasads executed and delivered a deed of trust to their property—"Parcel A" and "Parcel B"—to Viking Bank. The deed of trust secured their financial obligations to the bank.

In May 2007, the Prasads and Rehabitat participated in a boundary line adjustment to their adjacent properties. The recorded documents for this adjustment show that this transaction vested the Prasads with title to the Access Strip. At the same time, they also held an easement in the Access Strip. Moreover, Viking Bank held a deed of trust that encumbered both the Access Strip and the property it benefited to the south.

A diagram of the properties, as they appeared after the May 2007 boundary line adjustment, follows:



The Prasads defaulted on their loan from Viking Bank. In 2011, the bank directed a successor trustee under the deed of trust securing the bank's loan to conduct a nonjudicial foreclosure. The successor trustee did so, eventually conducting a trustee's sale in 2011.

WT Properties was the successful bidder at this trustee's sale. For reasons not relevant to this case, WT Properties obtained a trustee's deed only for Parcel A and Parcel B, and not also for the Access Strip, after this sale.

In 2012, the Prasads conveyed title to the Access Strip to Leganieds. The easement in the Access Strip was still of record.

In February 2014, WT Properties commenced this action, seeking to quiet title in the Access Strip to confirm the existence of the easement of record. Leganieds answered and made a counterclaim to quiet title to eliminate this easement.

In October 2014, the trial court granted summary judgment in favor of Leganieds, ruling that it was the fee owner of the Access Strip. But the court reserved for a future determination whether WT Properties held an easement in the Access Strip. Neither party contests that ruling.

In April 2015, WT Properties moved for summary judgment, seeking to quiet title in the easement in the Access Strip. Leganieds made a cross motion for summary judgment, seeking to quiet title in the Access Strip free and clear of this casement. The trial court granted summary judgment to WT Properties, ruling that it held an easement in the Access Strip. The trial court denied Leganieds's cross motion to quiet title.

The court also dismissed, without prejudice, Leganieds's claim to enforce the restrictive covenant in the Maybrook Plat that limited the use of property in the plat to "residential" use. It did so on the basis that this claim was not ripe for consideration.

WT Props., 195 Wn. App. at 346-49 (footnotes omitted).

The trial court's decision was affirmed on appeal. WT Props., 195 Wn. App. at 346. Despite the court rulings, from the record it does not appear that a boundary or lot line adjustment was ever recorded with the King County Assessor or the City.

Dimension acquired WT Properties' parcels in 2018.

-4-

B

In 2021, Dimension applied to the City of Burien to subdivide its property. Between September and November, Burien City Planner Chad Tibbits communicated with Dimension's engineer about the proposal. From the start, Tibbits expressed questions about the property lines, first directing Dimension to post one of the required yellow notice boards facing S. 170th Street because "[t]he property fronts S. 170th Street." Dimension explained that the smaller parcel, fronting 170th Street, was owned by a different entity and taxpayer, Leganieds.

In response, Tibbits asked why the King County Assessor showed the property as one parcel as depicted in the 2007 lot line adjustment. On November 9, 2021, Tibbits e-mailed Dimension's engineer stating:

> I am placing the project PLA 21-1636 on hold. No further review will commence until a full chain of title is produced for this lot showing the accurate lot boundaries. With the documentation you have provided, the lot was legally changed by the BLA PLA 07-0563 and shows the portion of Lot 17 still is incorporated into the property and at no time has there been a correction. No further subdivisions or boundary line adjustments have been recorded since.

Dimension provided the prior court documents and the statutory warranty deed showing the land Dimension purchased in 2018 and asked that the hold be removed.

Upon seeing the proposed development signs, Leganieds reached out to Tibbits asking whether they could obtain a building permit to build a single-family home on their lot—the Access Strip. Tibbits explained that the City had requested additional information:

> The information the applicant submitted to the city does not clearly show that Lot 17 exists as a legal lot. The documents provided thus far show it as part of the larger parcel (KC Parcel No. 292304-9180) to the south, this

configuration occurred with the boundary line adjustment in 2007. No other recording document has been submitted at this time.

On November 24, 2021, Leganieds's attorney Matt Adamson e-mailed Tibbits. In his e-mail, Adamson stated that Leganieds "owns a portion of the land that is subject to [Dimension's subdivision proposal]." He clarified, "[m]y client's land is a separate tax parcel. It is not, however, clear whether the city considers their land a separate legal lot. Both tax parcels appear to be part of Parcel C." Adamson notified the City that Leganieds was working with Dimension to see if they could agree on creating a separate legal lot for Leganieds's land but until then, Leganieds did not consent to a subdivision that includes their land.

On December 1, the City sent Dimension a formal letter placing review of the application on hold and requesting additional information. The letter stated:

> This information is being requested because the application and materials submitted for preliminary subdivision does not show the entire property as configured from the Lot Line Adjustment PLA 07-0563 in which Lot C was last modified and was shown to be 116,951 square feet in size. Since 2007 there have been no further lot line adjustments, short plats or subdivisions to alter the lot configuration.

Leganieds also received this letter.

Dimension sent further information from a surveyor about the boundary issues. On December 16, Adamson responded stating, "[w]e agree that my client's property has a separate legal description and a separate tax parcel ID number . . . [b]ut it is my understanding that the city's view is that, despite being a separate tax parcel, it is not a separate lot under [Burien Municipal Code] 17.10.160."

On December 22, 2021, Tibbits sent the following response to Dimension's second request to remove the hold:

> In 2007 the Lot Line Adjustment File No. PLA 07-0563 eliminated Lot 17 . . . Lot 17 of the Maybrook Plat was divided between Lot A, Lot B and Lot C. The City recognizes that Lot 17 of Maybrook Plat was extinguished when PLA 07-0563 was recorded. The City has not received a short plat or plat to reconstitute Lot 17 of the Maybrook Plat.

Separate from the communications with the City, Adamson tried to reach an agreement on this issue with Dimension's owner. After failing to provide additional information to process the application, the City considered Dimension's application withdrawn.

C

In October 2022, Dimension sued Leganieds for tortious interference, declaratory judgment, and injunctive relief.

Leganieds moved for summary judgment and dismissal under UPEPA and RCW 4.24.510. The trial court denied Leganieds's motion.

As allowed by UPEPA, Leganieds timely appealed the trial court's order denying its motion under UPEPA directly to this court. RCW 4.105.080.

II

UPEPA was drafted by the Uniform Law Commission to combat "an abusive type of litigation called a 'SLAPP' or 'strategic lawsuit against public participation.'" Jha v. Khan, 24 Wn. App. 2d 377, 386, 520 P.3d 470 (2022) (citing UNIF. L. COMM'N, THE UNIFORM PUBLIC EXPRESSION PROTECTION ACT (2020): A SUMMARY 1 (undated), https://www.uniformlaws.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=dcbe7300-b708-66eb-843a-8a66ddf3ad7b&forceDialog=1), review denied, 1 Wn.3d 1014, 530 P.3d 182 (2023). In 2021, Washington became the first state to adopt this uniform act. LAWS OF 2021, ch. 259; Jha, 24 Wn. App. 2d at 386.

UPEPA provides for early adjudication of baseless claims aimed at preventing an individual from exercising the constitutional right of free speech. Jha, 24 Wn. App. 2d at 387. UPEPA incorporates standards for adjudication that mirror those in Civil Rules 12 and 56. Jha, 24 Wn. App. 2d at 387. We review issues of statutory interpretation de novo. Pub. Util. Dist. No. 2 of Pac. County v. Comcast of Wash. IV, Inc., 8 Wn. App. 2d 418, 449, 438 P.3d 1212 (2019). Similarly, we review summary-judgment-like orders de novo, viewing all evidence in favor of the nonmoving party. Jha, 24 Wn. App. 2d at 389 (citing Boyd v. Sunflower Props., LLC, 197 Wn. App. 137, 142, 389 P.3d 626 (2016)).

Our review of a decision under UPEPA requires a three-step process. First, it is the moving party's burden to establish that UPEPA applies to the cause of action. RCW 4.105.060(1)(a). Second, once the moving party has satisfied this requirement, the burden shifts to the responding party to establish that a statutory exception applies. RCW 4.105.060(1)(b). And third, if the responding party does not demonstrate that an exception applies, the trial court must dismiss the action if either:

> (i) The responding party fails to establish a prima facie case as to each essential element of the cause of action; or
>
> (ii) The moving party establishes that:
>
> (A) The responding party failed to state a cause of action upon which relief can be granted; or
>
> (B) There is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the cause of action or part of the cause of action.

RCW 4.105.060(1)(c). We address each step in turn.

A

Leganieds argues that UPEPA applies to Dimension's tortious interference claim because Leganieds was communicating to the City on Dimension's subdivision application. We agree.

UPEPA applies to a complaint or cause of action when it is asserted against a person based on the person's:

> (b) Communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding;

> (c) Exercise of the right of freedom of speech or of the press, the right to assemble or petition, or the right of association, guaranteed by the United States Constitution or Washington state Constitution, on a matter of public concern.

RCW 4.105.010(2)(b)-(c).

Dimension's tortious interference claim is based on communications made by Leganieds to the City. At the time, the City was considering Dimension's subdivision application. Leganieds's communications were about Dimension's subdivision application. Thus, RCW 4.105.010(2)(b) applies.[1]

B

Dimension asserts in response that its tortious interference claim against Leganieds is exempt under RCW 4.105.010(3)(a)(v), which states UPEPA does not apply "[a]gainst a person named in a civil suit brought to establish or declare real property possessory rights, use of real property, recovery of real property, quiet title to

---

[1] Leganieds also asserts that subsection RCW 4.105.010(2)(c) applies because the cause of action is based on Leganieds's exercise of their right to petition the government on a matter of public concern. Because RCW 4.105.010(2)(b) applies we do not address Leganieds's claim under 4.105.010(2)(c).

real property, or related claims relating to real property." Leganieds argues that this exception does not apply because Dimension's claim is a tort claim seeking recovery in damages.[2] We agree with Leganieds.

While the facts underlying Dimension's tortious interference claim concern real property, the tortious interference claim is a tort claim for damages. Dimension's tortious interference claim asserts that Leganieds intentionally interfered with their subdivision application and caused it to stall and ultimately expire. The outcome of a successful tortious interference claim would result in a damages award—which is what Dimension sought. A successful claim for tort damages would not "establish or declare" possessory rights, use rights, or quiet title to Dimension's property. Dimension failed to establish that an exception to UPEPA applies.

We hold that Leganieds's communications fall within UPEPA.

C

Turning to the final step in the analysis, Leganieds argues that the trial court was required to dismiss Dimension's tortious interference claim because Dimension did not establish a prima facie case on an essential element of its tortious interference claim. We agree.

Under UPEPA, if the responding party does not demonstrate that an exception applies, the trial court must dismiss the action if the responding party fails to establish a prima facie case as to each essential element of the cause of action. RCW

---

[2] Dimension also sued for declaratory judgment and injunctive relief. However, those claims are not before us on this limited appeal under UPEPA. The trial court denied Leganieds's motion for summary judgment and dismissal of Dimension's claims for declaratory and injunctive relief. Presumably those claims remain active before the trial court.

4.105.060(1)(c)(i).  A lack of evidence to support a mandatory element of a claim requires dismissal of the claim on summary judgment.  See Guile v. Ballard Cmty. Hosp., 70 Wn. App. 18, 23, 851 P.2d 689 (1993).

Tortious interference with a business expectancy has five elements: (1) business relationship or expectancy, (2) defendant's knowledge of relationship, (3) intentional interference resulting in termination of relationship, (4) improper purpose or means, and (5) damages.  Pac. Nw. Shooting Park Ass'n v. City of Sequim, 158 Wn.2d 342, 351, 144 P.3d 276 (2006).

At issue is the third element, intentional interference resulting in termination of relationship.  Pac. Nw. Shooting Park, 158 Wn.2d at 351.  Leganieds argues that Dimension presented no evidence that Leganieds's communications with the City resulted in a termination of a business expectancy.  Dimension argues that "Leganieds' lies were the causal force that blocked Dimension's proposed subdivision."

The question is whether Leganieds's communications caused the City to terminate Dimension's subdivision application.  See Woods View II, LLC v. Kitsap County, 188 Wn. App. 1, 31, 352 P.3d 807 (2015).  Even drawing all factual inferences in Dimension's favor, a reasonable fact finder could not find that Leganieds caused the termination of Dimension's subdivision application.

The City contacted Dimension with concerns about its subdivision application between September 10 and November 9, 2021.  And the City Planner had already explained the City's concerns with Dimension about the 2007 lot line adjustment that still included the parcel that extended to S. 170th street, the parcel owned by Leganieds.  Dimension's application was placed on hold on November 9, 2021.

-11-

Leganieds's first communication with the City was to ask whether they could build a single-family home on their parcel. In both of Leganieds's communications with the City directly related to Dimension's subdivision application, Leganieds acknowledged that its property is a separate tax parcel, separately owned from Dimension's property. Those communications occurred on November 24 and December 16, 2021, well after Dimension's application was placed on hold. While the City requested more documentation from Dimension for the application to proceed, Dimension failed to provide the requested materials. Thus, it was not Leganieds that ended Dimension's relationship with the City, it was the City itself.

Because the City's hold occurred before the communications from Leganieds, Dimension failed to present evidence that Leganieds's communications "resulted in termination" of the subdivision application.

In sum, the trial court erred by ruling that Dimension had presented a prima facie case of tortious interference with a business expectancy. Because Dimension failed to satisfy its burden, the trial court should have granted Leganieds's UPEPA motion and dismissed Dimension's claim with prejudice.

III

Both parties request an award of attorney fees on appeal. And Leganieds argues that RCW 4.105.090 mandates an award of fees if they had prevailed in the trial court.

As the prevailing party, Leganieds is entitled to an award of fees under RAP 18.1 and RCW 4.105.090(1). See Jha, 24 Wn. App. 2d at 407. Additionally, because we hold that the UPEPA motion should have been granted in Leganieds's favor, Leganieds

is entitled to an award of reasonable attorney fees, court costs, and reasonable litigation expenses incurred in the trial court under RCW 4.105.090(1).  For the sake of judicial economy and to expedite relief, we instruct the trial court to make a determination as to the amount of attorney fees and costs awardable to Leganieds at both trial and appellate level.

We reverse and remand for the trial court to dismiss Dimension's tortious interference claim and award Leganieds attorney fees.[3]

_____Mann, J._____

WE CONCUR:

_____Birk, J._____      _____Dwyer, J._____

---

[3] Leganieds also argued that the tortious interference claim should have been dismissed because they were immune from suit under RCW 4.24.510.  But this argument is not subject to immediate appeal like the denial of a UPEPA motion under RCW 4.105.080.  The trial court denied Leganieds's motion for summary judgment under RCW 4.24.510.  Presumably whether RCW 4.24.510 applies remains before the trial court.